UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GREG V. JOHNSON : | |
| Plaintiff : | |
| : | |
| V. : | |
| : | |
| WALDEN UNIVERSITY, INC. : | |
| Defendant : | JANUARY 9, 2008 |

## COMPLAINT

**Allegations of Jurisdiction and Venue.**

1.  The Plaintiff Greg V. Johnson ("Johnson") is a natural person presently residing at 2228 Ellington Road, South Windsor, Connecticut.

2.  The Defendant Walden University, Inc. ("Walden") is a for-profit corporation organized under the laws of the State of Florida with a principal address of 650 South Exeter Street, Baltimore, Maryland 21202.

3.  Walden is registered to transact business as a foreign corporation in the State of Minnesota with a registered office address of 590 Park Street #6, Capitol Professional Building, St. Paul, Minnesota 55103.

4.  Walden maintains Capitol Corporate Services, Inc., 155 Office Plaza Drive, Suite A, Tallahasee, Florida 32301 as its agent for service of process.

5.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity between the Plaintiff and the Defendant, and because the matter in controversy is in excess of $75,000.00, exclusive of interest and costs.

6.  Venue is appropriate in the United States District Court, District of Connecticut, under 28 U.S.C. §1391(a)(2).

**COUNT I (Fraudulent Misrepresentation)**

1. At all times pertinent hereto, Walden operated a private, for-profit, self-styled "distance learning" educational institution which solicited prospective students, by means of the internet and other advertising media, to enroll and matriculate into degree courses in which substantially all coursework was to be completed on-line.

2. On or about February 4, 1997 and at pertinent times thereafter, Johnson was employed as a Staff Sergeant in charge of helicopter maintenance with the United States Marine Corps at Camp Butler, Okinawa, Japan, ran a part-time business, known as Futenma Professional Massage as a licensed massage therapist, and was a single parent of four boys, who lived with him at Camp Butler.

3. On or about February 4, 1997, Johnson held a Bachelor of Arts degree in psychology from Chaminade University, Hawaii, and was nearing completion of a Master of Human Relations degree from The University of Oklahoma, which was being taught on location at Camp Butler.

4. On or about February 4, 1997, Johnson was geographically isolated, by virtue of his overseas employment, and was chronically pressed for time because he held down two jobs and had parenting obligations for four children.

5. On or about February 4, 1997, Johnson was interested in obtaining the educational qualifications necessary to start and operate his own sport psychology practice, involving the counseling of clients, following his anticipated retirement from the Marine Corps and subsequent return to the United States.

6. On or about February 4, 1997, and at pertinent times prior to and thereafter, Walden was engaged in soliciting prospective students, by means of the internet and other advertising media, to enroll and matriculate into its degree courses.

7. On or about February 4, 1997 and at pertinent times prior to and thereafter, Walden intentionally targeted, by means of its advertising and marketing, adults such as Johnson, who were already employed, and sought career change and/or professional advancement.

8. Said advertising and marketing included statements to the effect that Walden's doctoral program in psychology was fully accredited, that said program was designed to meet the academic licensing requirements of most state licensure boards, that said program in fact met the standards of the American Psychological Association and met licensure requirements in many states, and that said program prepared students for career advancement in counseling, and to practice as a psychologist with clients, and that students who completed said program would be prepared to start their own psychology practice.

9. Walden distributed such advertising and marketing to Camp Butler's Educational Center, where it came to Johnson's attention.

10. On or about February 4, 1997 Johnson, induced by such advertising and marketing, contacted Walden requesting additional information and an application for admission.

11. On February 4, 1997, in response to Johnson's request, Sandra Flack, M.A., Walden's Associate Director of Student Recruitment, sent Johnson the requested additional information and application, and promised, in a cover letter, that "Walden's integrative model of doctoral education [would enable Johnson] to pursue a self-paced, professionally relevant program."

12. On or about August 28, 1997, in reliance upon the aforesaid representations, and acting upon his belief that a Ph.D. in psychology from Walden would enable him to realize his goal of starting and operating his own sport psychology practice counseling clients, Johnson applied for admission to Walden's doctoral program in Professional Psychology.

13. On or about August 28, 1997 and at pertinent times thereafter, Walden operated a Division of Psychology, which included said doctoral program in Professional Psychology and a post-doctoral Psychology Certificate Program.

14. On or about August 28, 1997 and at pertinent times thereafter, students admitted to Walden's doctoral program in Professional Psychology were required to pursue studies in one of the following specializations: Academic Psychology, Clinical Psychology, Counseling Psychology, Health Psychology, Organizational Psychology, School Psychology, and Sport Psychology.

15. In his application, Johnson advised Walden that his intended field of study was Professional Psychology, with a specialization in Sport Psychology.

16. By means of a telephone interview in connection with said application, Johnson was asked to describe his career goal, and he thereby informed Walden that his goal in applying for admission was to start and operate his own sport psychology practice counseling clients.

17. In October, 1997, Walden accepted Johnson into its Professional Psychology Program, with a specialization in Sport Psychology.

18. Johnson matriculated into Walden's Professional Psychology Program in the academic quarter which began in December, 1997.

19. Upon his matriculation into Walden's Professional Psychology Program, Walden gave Johnson a loose-leaf binder entitled "Walden University Professional Psychology Program", which contained, *inter alia*, a detailed description of Walden's Professional Psychology curriculum, a Psychology Student Handbook (the "Handbook"), and instructions for creating a Professional Development Plan and a Plan of Study.

20. The Handbook described the mission of the Professional Psychology Program as "to prepare practicing psychologists who can address important social problems that impact the lives of

4

individuals, families, and organizations. Our nationally accredited curriculum emphasizes theoretical and research-derived knowledge and clinical skills that prepare psychologists to function as change agents in their areas of specialization."

21.     Upon his matriculation into Walden's Professional Psychology Program, Johnson read the Handbook and reasonably understood the aforesaid mission statement to apply to the entire Professional Psychology Program, and to all specializations included therein, including the Sport Psychology specialization.

22.     By its own terms, the aforesaid mission statement did, in fact, apply to the entire Professional Psychology Program, and to all specializations included therein, including the Sport Psychology specialization.

23.     Upon his matriculation into Walden's Professional Psychology Program, Johnson read the Handbook and reasonably understood the term "psychologists", as used in the aforesaid mission statement, to mean or include practitioners of clinical psychology, counseling, or guidance.

24.     The Handbook described itself as "not the only source of information available to [Walden students], but it is the touchstone."

25.     The Handbook also stated that, of the other sources of information available to Walden students, "the most important for academic issues is the Faculty Mentor".

26.     The Handbook also stated that new students are assigned to a Faculty Mentor qualified to guide students in the specialization to which the student has been admitted. Assignments are made at the point of the admission interview after a careful assessment of the student's background and professional goals."

27.     The Handbook also stated that "[t]he first document new psychology students develop is the Professional Development Plan (PDP). The PDP is a narrative description of your personal and

5

professional background and the factors that contributed to your decision to pursue doctoral study in professional psychology….Along with the Plan of Study, the PDP is submitted to your Faculty Mentor (FM) as a means of introducing you to your FM. Your FM is thereby able to appreciate your history and future aspirations as a professional psychologist….As you might suspect, the PDP and Plan of Study permit your FM and others to advise you effectively over the course of your doctoral study at Walden."

28. Appendix A of the Handbook ("Professional Development Plan Instructions") instructed Johnson to "[d]escribe your career goals for the next five years. Include in this discussion how you intend to practice as a psychologist, which state(s) you will seek a psychology license (if applicable), and in what kind of settings you plan to practice."

29. In response to the foregoing instruction, Johnson composed a Professional Development Plan which stated that "my short range scholarly goal is to finish my degree, so I can give better service and advice to recipients of my therapy."

30. Said statement notified Walden of Johnson's intention to use his degree from Walden to add the element of psychological counseling to recipients of his physical therapy who are in the process of recovering from physical injuries, including, without limitation, coping with the vocational, psychological, and family stresses of reduced physical functioning resulting from such injuries.

31. Johnson also stated, in his Professional Development Plan, that "my long range goal is to have a for-profit hospital add an alternative care unit (Therapeutic massage) or wing onto their hospital. This unit will provide preventive, drug free alternative therapies (massage, acupuncture, rolfing, foot reflexology) to business employers or individuals at a reasonable price."

32. Upon Johnson's matriculation into Walden's Professional Psychology Program, Walden assigned Dr. John Anderson ("Dr. Anderson") as Johnson's Faculty Mentor after assessing Johnson's professional goals, as aforesaid.

33. In addition to being employed by Walden as a member of Walden's faculty, Dr. Anderson was, at all pertinent times, a licensed sport psychologist involved in the training of athletes for performance-enhancement.

34. At all pertinent times, Dr. Anderson acted as an agent of Walden in his capacity as Johnson's Faculty Mentor.

35. By means of the aforesaid Professional Development Plan, and by means of other communications with Dr. Anderson, Walden knew, or reasonably should have known, that Johnson's professional goals included enlarging the scope of Johnson's existing part-time occupation as a massage therapist to include giving advice and offering alternative therapies to clients, as aforesaid.

36. By means of the aforesaid Professional Development Plan, and by means of other communications with Dr. Anderson, Walden knew, or reasonably should have known, that Johnson had enrolled at Walden to attain the goal of practicing sport psychology in a clinical (as opposed to a research) setting, by counseling, or guiding clients with respect to a variety of alternative therapies.

37. Upon Johnson's matriculation into Walden's Professional Psychology Program, Dr. Anderson advised Johnson that, upon completion of his intended course of study at Walden, Johnson would be qualified to practice sport psychology in a clinical (as opposed to a research) setting, by counseling, or guiding clients.

38. Upon Johnson's matriculation into Walden's Professional Psychology Program, Dr. Anderson further advised Johnson that, because sport psychology was a non-regulated field, upon completion of his intended course of study at Walden, Johnson would be qualified to practice sport psychology in a clinical (as opposed to a research) setting, by counseling, or guiding clients, without obtaining a license.

39.     The aforesaid representations were false and misleading because, although state licensure is generally not needed to work in a research or teaching position involving psychology, state licensure is required to legally practice clinical psychology, that is, to offer counsel or guidance to clients concerning psychology, including sport psychology.

40.     The aforesaid representations were part of a course of conduct by Walden which was calculated to convey the impression that successful completion of a course of study in Walden's Professional Psychology Program would qualify the graduate to legally practice clinical psychology, that is, to offer counsel or guidance to clients concerning psychology, in a range of specializations, including sport psychology.

41.     In fact, at all pertinent times hereto through the present, most or all states prohibit the clinical practice of psychology, including sport psychology, without a license.

42.     In fact, at all pertinent times hereto through the present, accreditation of a course of study in psychology by the American Psychological Association was, and is, necessary to sit for the psychology licensure examinations of most or all state licensure boards.

43.     Despite Walden's representations to the effect that its Ph.D. program in psychology was fully accredited and prepared students to counsel clients, said program was, at all pertinent times hereto through the present, not accredited by the American Psychological Association (the "APA").

44.     According to statements later published by Walden, Walden intentionally declined to pursue APA accreditation for Walden's Ph.D. program in psychology, ostensibly because Walden believed that pursuit of APA accreditation would impose "restrictions" on the supposed "broad access" and "flexibility" inherent in Walden's Ph.D. program, and because pursuit of APA accreditation would "significantly constrain its curriculum" by precluding "a focus on international views of psychology, as well as other views of psychology that are not part of mainstream academic thought."

45. Walden's psychology curriculum was not equivalent to the standards established by the APA, primarily because Walden's mode of education, *i.e.*, "distance-learning", was not conducive to meeting those standards.

46. At the time of Johnson's admission, and at all pertinent times hereto through the present, Walden knew that it could not offer Johnson any program which would qualify him, upon completion, to legally practice clinical psychology, that is, to offer counsel or guidance to clients concerning psychology, in a range of specializations, including sport psychology.

47. The aforesaid representations made or published by Walden and/or its agents to the effect that, upon completion of his intended course of study at Walden, Johnson would be qualified to practice sport psychology in a clinical (as opposed to a research or teaching) setting, by counseling, or guiding clients, were intentionally false and misleading, or were made recklessly or negligently.

48. The aforesaid representations made or published by Walden and/or its agents were intended to induce prospective students such as Johnson having career goals involving counseling psychology clients to apply for admission to Walden.

49. Walden failed and omitted to fully and accurately disclose to Johnson the fact that it could not offer him a doctoral program which would enable him to meet his career goals involving counseling psychology clients.

50. Upon matriculating, Johnson began an intensive course of study which he reasonably expected would culminate in his becoming a sport psychologist qualified to offer counseling and guidance to clients.

51. After completing two years of coursework, Walden informed Johnson that it had discontinued the Sport Psychology specialization, and that his only recourse was to switch to another specialization within Walden's Professional Psychology Program.

52. Unbeknownst to Johnson, Walden gave other students in the Sport Psychology specialization the option to complete their coursework in the Sport Psychology specialization.

53. Walden did not extend said option to Johnson, and failed and neglected to inform Johnson that said option existed.

54. As a result, Johnson was effectively forced to change his specialization to Health Psychology.

55. Through Johnson's Faculty Mentor, Walden informed Johnson that the Health Psychology specialization was similar to the Sport Psychology specialization, and that completion of the program in the Health Psychology specialization would enable Johnson to meet his career goals involving counseling psychology clients.

56. In fact, for all of the reasons aforesaid, successful completion of a course of study in Walden's Health Psychology specialization could no more qualify Johnson to practice clinical psychology, that is, to offer counsel or guidance to clients concerning psychology, than could successful completion of a course of study in Walden's Sport Psychology specialization.

57. In reliance on all of the aforesaid representations, Johnson expended nearly $200,000.00 for tuition, including liabilities incurred for student loans, and expenses, which included roundtrip airfare from Japan to Chicago to meet Walden's mandatory four-week residency requirement, as well as the cost of private tutoring necessary to complete his dissertation.

58. In January, 2000 Johnson retired from the United States Marine Corps and moved to Atlanta, Georgia, where he obtained full-time employment while continuing to pursue his doctoral studies with Walden, on-line, in the evenings and on weekends.

59. In June, 2000 Johnson moved to Connecticut, where he obtained full-time employment while continuing to pursue his doctoral studies with Walden, on-line, in the evenings and on weekends.

60. Walden failed and omitted to provide Johnson with the guidance and assistance to complete his dissertation, because Walden had no faculty member who was familiar with the research methodology ("meta-analysis") which Johnson's Faculty Mentor suggested he should use to complete the dissertation.

61. As a result of Walden's failure and omission to provide Johnson with the guidance and assistance to complete his dissertation, the time and expense of completing his coursework was unnecessarily multiplied.

62. Throughout Johnson's course of study, Walden failed and omitted to correct the misrepresentations it had made and the misperceptions it had created, as aforesaid, with respect to its ability to offer a course of study which would enable Johnson to meet his professional goals.

63. Throughout Johnson's course of study, Walden continued to make similar misrepresentations and create similar misperceptions, with respect to its ability to offer a course of study which would enable Johnson to meet his professional goals.

64. Walden's continuing failures and omissions, and its continuing misrepresentations, as aforesaid, constitute a continuing course of conduct which persisted throughout Johnson's course of study until the date of his graduation.

65. On or about November 29, 2006, after almost ten years of work and expense, Johnson completed his coursework in Walden's Professional Psychology Program with a specialization in Health Psychology, and, on February 2, 2007, obtained a Ph.D. from Walden University.

66. For the reasons stated aforesaid (*i.e.*, Walden's lack of relevant accreditation, and the fact that Walden's psychology curriculum is not equivalent to the standards established by the APA), Johnson is unable to sit for any licensure examination which would enable him to offer counseling and guidance in psychology to clients.

67. Without such licensure (and contrary to numerous representations made by Walden and its agents), Johnson is prohibited by law from offering counseling and guidance in psychology to clients.

68. By way of example, the State of Connecticut, where Johnson now resides, prohibits the practice of psychology without a license, and, at all times pertinent hereto, has defined the practice of psychology as "the rendering of professional services under any title or description of services incorporating the words psychologist, psychological or psychology, to the public or to any public or private organization for a fee or other remuneration. Professional psychological services means the application, by persons trained in psychology, of established principles of learning, motivation, perception, thinking and emotional relationships to the assessment, diagnosis, prevention, treatment and amelioration of psychological problems or emotional or mental disorders of individuals or groups, including but not limited to counseling, guidance, psychotherapy, behavior modification and personnel evaluation, with persons or groups in the areas of work, family, school, marriage and personal relationships; measuring and testing of personality, intelligence, aptitudes, emotions, public opinion, attitudes and skills; and research relating to human behavior."

69. As a result of his inability to practice in his chosen occupation, Johnson's doctoral degree is worthless to him with respect to obtaining the career goal which led to apply to Walden in the first place, matriculate, and ultimately graduate from Walden.

70. Johnson would have been eligible to sit for a licensure examination in psychology had Walden obtained APA accreditation or achieved equivalency with APA standards at the time of Johnson's graduation.

71. Johnson suffered economic loss by investing his time and money for ten years to attain a goal (*i.e.*, being unable to practice in psychology offering counseling and guidance to clients), which Walden knew or should have known was unavailable to him, yet persisted in encouraging him to pursue.

72. Johnson will continue to suffer economic loss by being unable to practice in psychology offering counseling and guidance to clients.

73. By representing to Johnson that he would be qualified to practice in psychology offering counseling and guidance to clients upon completion of Walden's Professional Psychology Program, Walden and its agents made one or more false statements as statements of fact.

74. Such statements were untrue and known to be untrue by the parties making them.

75. Such statements were made to induce Johnson to act upon them, by enrolling at Walden and paying Walden fees and tuition, which Johnson did from the date of his matriculation through his graduation.

76. Johnson did so act upon the false representations to his injury.

**COUNT II (Negligent Misrepresentation)**

1.- 72. Paragraphs 1 through 72 of Count I are hereby adopted by reference as Paragraphs 1 through 72 of this, Count II.

73. By representing to Johnson that he would be qualified to practice in psychology offering counseling and guidance to clients upon completion of Walden's Professional Psychology Program, Walden and its agents made one or more misrepresentations of fact that they knew or should have known were false.

74. Johnson reasonably relied upon such representations by enrolling at Walden and paying Walden fees and tuition, which Johnson did from the date of his matriculation through his graduation.

75. Johnson suffered pecuniary harm as a result thereof.

**COUNT III (CUTPA)**

1.- 72. Paragraphs 1 through 72 of Count I are hereby adopted by reference as Paragraphs 1 through 72 of this, Count III.

73. Walden and its agents voluntarily undertook to disclose to Johnson facts concerning whether Johnson's completion of Walden's Professional Psychology Program would qualify him to practice in psychology offering counseling and guidance to clients.

74. Walden had a duty to truthfully and accurately disclose such facts arose as a result of such voluntary undertaking.

75. The facts disclosed to Johnson by Walden and its agents, concerning whether Johnson's completion of Walden's Professional Psychology Program would qualify him to practice in psychology offering counseling and guidance to clients, were neither truthful nor accurate.

76. The facts disclosed to Johnson by Walden and its agents, concerning whether Johnson's completion of Walden's Professional Psychology Program would qualify him to practice in psychology offering counseling and guidance to clients, did not constitute a full and fair disclosure as to such matters.

77. Such practice offends public policy as it has been established by statutes, the common law, or otherwise, or is within at least the penumbra of a common law, statutory, or other established concept of unfairness.

78. Such practice caused substantial injury to Johnson as a consumer.

79. Such practice constituted an actual deceptive practice or a practice amounting to a violation of public policy in contravention of the Connecticut Unfair Trade Practices Act (Connecticut General Statutes § 42-110a, *et. seq.*).

**COUNT IV (Breach of Implied Contract)**

1.- 72. Paragraphs 1 through 72 of Count I are hereby adopted by reference as Paragraphs 1 through 72 of this, Count IV.

73. By representing to Johnson that he would be qualified to practice in psychology offering counseling and guidance to clients upon completion of Walden's Professional Psychology Program, and by engaging in the aforesaid course of dealing and usage of trade, Walden and its agents made an implied promise that the program into which Johnson enrolled would, by the time of his graduation, be of sufficient quality so as to qualify Johnson to practice in psychology offering counseling and guidance to clients.

74. Walden breached said implied contract by failing to maintain or establish, by the time of Johnson's graduation, said program as one of sufficient quality so as to qualify Johnson to practice in psychology offering counseling and guidance to clients.

75. As a result of such breach, Johnson will not realize the economic benefit he bargained for by enrolling in Walden.

**COUNT V (Promissory Estoppel)**

1.- 75. Paragraphs 1 through 75 of Count IV are hereby adopted by reference as Paragraphs 1 through 75 of this, Count V.

76. In making the aforesaid promises to Johnson, Walden and its agents should reasonably have expected to induce action on the part of Johnson, including enrolling at Walden and paying Walden fees and tuition.

77. The aforesaid promises did induce such action on the part of Johnson.

78. The aforesaid promises should be binding because injustice can be avoided only by enforcement of such promises.

**COUNT VI (Breach of Implied Covenant of Good Faith and Fair Dealing)**

1.- 75. Paragraphs 1 through 75 of Count IV are hereby adopted by reference as Paragraphs 1 through 75 of this, Count VI.

76. Johnson and Walden were parties to a contract under which Johnson reasonably expected to receive certain benefits, specifically, that he would be qualified to practice in psychology offering counseling and guidance to clients upon completion of Walden's Professional Psychology Program.

77. By failing to maintain or establish, by the time of Johnson's graduation, its Professional Psychology Program as one of sufficient quality so as to qualify Johnson to practice in psychology offering counseling and guidance to clients, Walden engaged in conduct that injured Johnson's right to receive some or all of those benefits.

78. When committing the acts by which it injured Johnson's right to receive such benefits, which Johnson reasonably expected to receive under the contract, Walden was acting in bad faith, since it not only knew that its Professional Psychology Program was one of insufficient quality so as to qualify Johnson to practice in psychology offering counseling and guidance to clients, but intentionally declined to attempt to so establish the program.

WHEREFORE, the Plaintiff prays for:

### AS TO COUNT I (Fraudulent Misrepresentation)

1. Money damages, including but not limited to the difference between the actual value of the education the Plaintiff received and its value had it been as represented;

2. Consequential damages;

3. Punitive damages;

4. Attorney's fees;

5. Costs;

6. Interest pursuant to Connecticut General Statutes §37-1; and

7. Such other and further relief as to which law and/or equity may pertain.

### AS TO COUNT II (Negligent Misrepresentation)

1. Money damages, including but not limited to the difference between the actual value of the education the Plaintiff received and its value had it been as represented;

2. Consequential damages;

3. Interest pursuant to Connecticut General Statutes §37-1; and

4. Such other and further relief as to which law and/or equity may pertain.

### AS TO COUNT III (CUTPA)

1. Punitive damages;

2. Costs;

3. Reasonable attorney's fees;

4. Civil penalties as authorized by Connecticut General Statutes § 42-110o for each violation of the CUTPA;

5. Interest pursuant to Connecticut General Statutes §37-1; and

6. Such other and further relief as to which law and/or equity may pertain.

### AS TO COUNT IV (Breach of Implied Contract)

1. Money damages, including but not limited to expectancy damages;

2. Interest pursuant to Connecticut General Statutes §37-1; and

3. Such other and further relief as to which law and/or equity may pertain.

### AS TO COUNT V (Promissory Estoppel)

1. Money damages, including but not limited to reliance damages;

2. Interest pursuant to Connecticut General Statutes §37-1; and

3. Such other and further relief as to which law and/or equity may pertain.

**AS TO VI (Breach of Implied Covenant of Good Faith and Fair Dealing)**

1. Money damages, including but not limited to expectancy damages;

2. Interest pursuant to Connecticut General Statutes §37-1; and

3. Such other and further relief as to which law and/or equity may pertain.

Dated at Avon, Connecticut this 9th day of January, 2008.

PLAINTIFF,

By _____
Edward P. Jurkiewicz /ct04779
Lawrence & Jurkiewicz, LLC
30 East Main Street
Avon, CT 06001
Telephone: (860) 677-6416
Fax: (860) 677-5005
edwardjurkiewicz@sbcglobal.net
His Attorney