UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                            :
GREG V. JOHNSON                             :        NO. 3:08 CV 0045 (DJS)
Plaintiff                                   :
                                            :
V.                                          :
                                            :
WALDEN UNIVERSITY, INC.                     :
            Defendant                       :
_____:            JUNE 5, 2009

**<u>MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>**

<u>I.</u>        <u>Basic Facts.</u>

As discussed in more detail below and in the accompanying *Affidavit of Greg V. Johnson* (hereafter, the "*Affidavit*"), the Plaintiff was a United States Marine on active duty in Okinawa, Japan when he encountered the Defendant Walden University's advertising offering a doctoral program in psychology whereby most course work was conducted via "distance-learning", that is, over the Internet. *Affidavit* ¶¶ 3-9. Johnson, who wanted to become a practicing sport psychologist to complement his experience as a massage therapist, applied to Walden's Professional Psychology Program, and was accepted to its sports psychology specialization. *Affidavit* ¶¶ 10-14.

In Walden's *Handbook* (Defendant's *Exhibit C*)[1], which it gave to Johnson soon after he was accepted, Walden made numerous statements that the mission of its Professional Psychology Program was to prepare practicing psychologists, and required Johnson to submit a narrative description of his aspirations as a professional psychologist to his Faculty Mentor, a Walden employee charged with assisting Johnson in meeting his career goals in that regard. *Affidavit* ¶¶ 17-22, *Exhibit C* at 3-4, 15-16.

_____
[1]        All numbered exhibits cited herein are identified by and appended to the *Affidavit of Greg V. Johnson*. All lettered exhibits cited herein were submitted by Walden in support of its *Motion For Summary Judgment*.

Although the *Handbook* Johnson received at the time he became a student designated "licensure" and "non-licensure" specializations  within Walden's Professional Psychology Program (with the sport psychology specialization designated as a non-licensure specialization)(*see Exhibit C* at 17-18, *Affidavit* ¶ 26), the *Handbook* did not explain many relevant aspects of "licensure", including the fact that, "[w]ithout a license to practice psychology, individuals may neither engage in the practice of psychology nor describe themselves as "psychologists" except under specific limited circumstances" (*see Affidavit* ¶ 25, Plaintiff's *Exhibit 2*, (*Expert Report of Brett A. Steinberg, Ph.D.*) at 1).

Johnson, who was geographically isolated, and somewhat socially isolated from other students who would be concerned about such matters, had no independent knowledge of the ramification of being licensed, or not, and believed the representations Walden made in its *Handbook* that completion of the Professional Psychology Program would prepare him for a career as a practicing psychologist. *Affidavit* ¶¶ 27, 28. That belief was plausible, because such representations literally applied to all areas of specialization within Walden's Professional Psychology Program, not just the so-called licensure specializations. *Affidavit* ¶¶ 17-22, 26, *Exhibit C* at 3-4, 15-16.

Johnson could not know that Walden was also disseminating misinformation about the accreditation status of its Professional Psychology Program as a whole, which Walden's *Handbook* described as its "nationally accredited curriculum"(*see Exhibit C* at 4 (§ 1.1)). In fact, "[b]ecause Walden University's clinical, counseling, and school psychology doctoral programs are neither accredited by the American Psychological Association nor jointly designated by the Association of State and provincial Psychology Boards and the National Register of Health Service Providers in Psychology…graduates may not sit for the national psychology licensing boards of most states." *Exhibit 2* (*Expert Report of Brett A. Steinberg, Ph.D.*) at 1.

As a result, when answering Johnson's interrogatories in the present case, Walden was only able to identify five graduates in the entire history of its Professional Psychology Program that had successfully obtained licensure and were able to become practicing psychologists. *Affidavit* ¶ 29, *Exhibit 3* at 9.

Johnson could not know that the affirmative misrepresentations Walden made to him were part of a long-standing pattern of concealment and misrepresentations about its Professional Psychology Program as a whole. Dr. Steinberg opined that "the implications of non-accreditation and non-designation" of the purported licensure specializations "are not fully apparent" (*Exhibit 1* at 6), and that Walden "did not fully communicate the adverse licensure-related implications of non-accreditation by the APA and non-designation by the ASPPB/National Register"(*Exhibit 2* at 14).

The statements Walden published in its *Handbook*, that completion of the Professional Psychology Program would prepare Johnson for practice as a psychologist were exacerbated by Johnson's first Faculty Mentor, John E. Anderson, Ph.D. Although Dr. Anderson was himself a licensed psychologist and a practicing sport psychologist, he told Johnson that he (Johnson) would not need a license to hold himself out as and practice as a sport psychologist, and that he could become one by completing the Professional Psychology Program. *Affidavit* ¶¶ 36-42. When Walden subsequently discontinued its sport psychology specialization, a subsequent Faculty Mentor falsely told Johnson he could still become a sport psychologist by switching his area of specialization to health psychology, another area of specialization within Walden's Professional Psychology Program, which Johnson did. *Affidavit* ¶¶ 43-48.

It took Johnson a total of nine years to complete the program's core curriculum and his dissertation, during which time he was continually advised by a Faculty Mentor and a four-person dissertation committee, all of whom had, as discussed below, at least a high degree of responsibility, and

perhaps a fiduciary obligation, to foster the realization of Johnson's goal to become a practicing psychologist, yet they failed to disabuse him of the belief inculcated by Walden that completing the Professional Psychology Program would enable him to practice as a psychologist. *Affidavit* ¶¶ 52-55.

While Johnson was completing his dissertation, on January 26, 2006, Walden conducted an on-line question-and-answer forum regarding its psychology licensure in which it publicly spread additional false information concerning its psychology program. As described in Dr. Steinberg's expert report:

> On 26 Jan 2006, Walden University conducted a question-and-answer forum regarding psychology licensure….Although it was acknowledged that Walden University licensure specializations were not accredited by the APA, such accreditation was said to be a requirement for licensure in only "some states" and the impact of non-accreditation was described as "highly subjective and depends on the individual in pursuit of the degree". In response to "Why are you not pursuing APA accreditation?", it was stated "It is not in our best interest at this time. The program meets the standards of the APA and meets licensure requirements in many states." In fact, without APA accreditation and/or ASPPB/National Register designation, the Walden licensure specializations produced graduates who could not routinely sit for the [national examination] in 8/10 states.

*Exhibit 2* at 6.

Upon completing Walden's Professional Psychology Program on or about November 29, 2006 and obtaining his Walden Ph.D. on February 2, 2007, Johnson sought, and was denied, employment as a psychologist, because he did not have a license to practice psychology. *Affidavit* ¶¶ 58-59. He therefore applied to sit for Connecticut's psychology licensure examination, but Connecticut did not allow him to do so, because of the lack of relevant accreditation of Walden's program. *Affidavit* ¶ 60.

Having paid Walden for tuition and expenses, incurred student loans to do so, having lost the increased earning potential a psychology practice would have brought him, and given up nearly a decade of his free time, Johnson brought the present diversity action, alleging, in a six-count *Complaint*, alternative causes of action sounding in fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), CUTPA (Count III), breach of implied contract (Count IV), promissory estoppel (Count V), and breach of the implied covenant of good faith and fair dealing (Count VI).

Seeking to deny Johnson his day in court, Walden now brings the present *Motion for Summary Judgment* presenting various arguments, which are addressed below.

II.     The Standard For Summary Judgment.

The role of the court on summary judgment is "not to try issues of fact, but only to determine whether there are issues of fact to be tried." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 256, and present such evidence that would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Anderson*, 477 U.S. at 255. "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 253 (2d Cir. 2002).

III.     Argument.

A.     The Present Case Presents Cognizable Causes Of Action Against An Educational Institution, In Both Contract and Tort, Because the Facts Of the Case Are Within Both Of the Two Exceptions To the Prohibition Against "Educational Malpractice" Actions Set Forth In *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996).

At page 19 of its *Memorandum*, Walden cites *Gupta v. New Britain General Hospital*, 239 Conn. 574, 590 (1996) for the proposition that "Connecticut courts have been extremely hesitant to recognize contractual claims arising out of educational services", and argues that, although there are two exceptions to this general rule, "[n]either situation is presented here." Walden actually understates the

general rule, because *Gupta*'s general prohibition against "educational malpractice" actions encompasses both actions sounding in tort and actions sounding in contract.

In *Gupta v. New Britain General Hospital*, 239 Conn. 574, 590-591 (1996) Connecticut's Supreme Court held that, for reasons of policy, "educational malpractice" is generally not cognizable as a tort cause of action, and that the same considerations also generally disfavor contract claims based on inadequate educational services. Observing that "[i]n educational malpractice cases, a plaintiff sues his or her academic institution for *tortiously* failing to provide adequate educational services" (*Gupta*, 239 Conn. at 591 (n. 15)), the court explained that such a claim:

> raises questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students—questions that must be answered by reference to principles of duty, standards of care, and reasonable conduct associated with the law of torts. Because these tort principles are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of "educational malpractice" are not cognizable. Among other problems for adjudication, these claims involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and deciding whether that standard has been breached….The jurisprudential considerations that shed doubt on the viability of the tort of educational malpractice also inform our analysis of a *contract* claim based on inadequate educational services.

*Gupta*, 239 Conn. at 590-591 (emphasis in original). "In making such claims…courts are required not merely to make judgments as to the validity of broad educational policies…but, more importantly, to sit in review of the day-to-day implementation of these policies." *Gupta*, 239 Conn. at 591 (quotation, citation omitted).

However, *Gupta* also held:

> [t]here are, however, at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services. The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. The second would arise if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program.

*Gupta*, 239 Conn. at 592-593. Under the *Gupta* "doctrine", causes of action premised on tort and other non-contractual theories of liability are also permitted, so long as they are within one or both of the *Gupta* exceptions. *See, e.g. Doe v. Yale University*, 252 Conn. 641, 659 (2000)(rejecting the notion that the common law duty of care "disappear[s] when the negligent conduct occurs in an educational setting"), *Johnson v. Schmitz*, 119 F. Supp.2d 90, 99 (D. Conn. 2000)(rejecting the argument that cognizable non-contract causes of action in an educational setting are limited to negligence causing physical harm), and *Osberg v. Yale University*, 2009 Conn. Super. LEXIS 473 at 12-13 (recognizing a CUTPA claim that fell within a *Gupta* exception).

    <u>i.       Genuine Issues Of Fact Exist As To Whether Walden Failed In a Fundamental Respect By Not Offering Johnson Any Courses Which Would Assist Him In His Stated Goal Of Becoming a Practicing Psychologist.</u>

    Walden's failure in this regard is thoroughly documented by the expert report of Brett A. Steinberg, Ph.D. dated January 12, 2009 (*Exhibit 2*). Asked to opine whether Walden had made or published false or misleading representations concerning its psychology program, its accreditation, the realistic possibility of a graduate of the program obtaining licensure as a practicing psychologist, or the ability to hold him or herself forth as a "psychologist" in general, Dr. Steinberg began by explaining the legal requirements for practice:

> [t]he practice of professional psychology is regulated by law in 50 states of the U.S., the territories of Guam, Puerto Rico, U.S. Virgin Islands, and the District of Columbia, and in 10 provinces of Canada. The laws are intended to protect the public by limiting licensure to persons who are qualified to practice psychology as defined by state or provincial law….Sixty two states, provinces and territories in the U.S. and Canada require licensure applicants to pass a multiple-choice examination known as the Examination for Professional Practice in Psychology, or EPPP….The individual seeking licensure applies to his or her jurisdictional licensing authority to sit for the examination. The licensing authority reviews the credentials of the applicant and determines if he or she meets the requirements set in the laws of the state or province.

*Exhibit 2* at 1-2.

Dr. Steinberg's report continues: "[t]he ASPPB [Association of State and Provincial Psychology Boards, which developed the EPPP in 1965] published a model act for licensure of psychologists in 2001….According to the model act for licensure, an individual may not, except under certain conditions, represent himself/herself as a "psychologist" or render services defined as the practice of psychology without being licensed as a psychologist." *Exhibit 2* at 2.

In Connecticut, § 20-187a of the General Statutes defines the practice of psychology broadly[2], and states "[n]o person shall practice psychology unless he has obtained a license…."

Dr. Steinberg's report further explains that, according to the model act, applicants for psychology licensure cannot sit for the EPPP unless they have met specific educational criteria, either: A-) having obtained a degree from a doctoral psychology program in an institution of higher education accredited by the American Psychological Association ("APA") or the Canadian Psychological Association ("CPA") or listed in Doctoral Psychology Programs Meeting Designation Criteria; or B-) demonstrating that the program from which the applicant obtained his degree meets eleven specific criteria, including "a coordinated practicum experience that totals at least two…semesters of practicum and one…year in a predoctoral practicum setting" and involves "at least one continuous academic year of full-time

---

[2]     Section 20-187a states that "[t]he practice of psychology means the rendering of professional services under any title or description of services incorporating the words psychologist, psychological or psychology, to the public or to any public or private organization for a fee or other remuneration. Professional psychological services means the application, by persons trained in psychology, of established principles of learning, motivation, perception, thinking and emotional relationships to the assessment, diagnosis, prevention, treatment and amelioration of psychological problems or emotional or mental disorders of individuals or groups, including but not limited to counseling, guidance, psychotherapy, behavior modification and personnel evaluation, with persons or groups in the areas of work, family, school, marriage and personal relationships; measuring and testing of personality, intelligence, aptitudes, emotions, public opinion, attitudes and skills; and research relating to human behavior." Connecticut General Statutes § 20-188 provides that "[a]ny person not licensed…who…represents himself as a psychologist…or carries on the practice of psychology…shall be fined not more than five hundred dollars or imprisoned not more than five years or both, and each instance of patient contact or consultation which is in violation of this section shall be deemed a separate offense."

residency or two years of half-time residency on the campus of the institution from which the degree is granted….” *Exhibit 2* at 2-5.[3]

> Based on this information, Dr. Steinberg states:

> [a]s of 12 Jan 2009, 40 of 50 states (80%) required APA accreditation and/or ASPPB/National Register designation for at least one form of licensure…for at least one state, Connecticut, APA accreditation was identified as a requirement even though the state’s licensing regulations stated that a program would be considered an approved program for licensure purposes if it met specific criteria, as discussed next….a graduate of a doctoral program that was neither APA-accredited nor ASPPB/National Register-designated would have to demonstrate that his/her program met 11 criteria…in order to establish his/her eligibility to sit for the EPPP. In essence, graduates from such a program would be ineligible to take the national licensure examination in 8 out of 10 states unless they persuaded licensing boards, on a case-by-case basis, that their program met the specific criteria.

*Exhibit 2* at 5. Accordingly, Dr. Steinberg concluded that

> [b]ecause Walden University’s clinical, counseling, and school psychology doctoral programs are neither accredited by the American Psychological Association nor jointly designated by the Association of State and Provincial Psychology Boards and the National Register of Health Service Providers in Psychology…graduates may not sit for the national psychology licensure examination unless special exceptions are granted, on a case-by-case basis, by the psychology licensing boards of most states.

 *Exhibit 2* at 1. Dr. Steinberg’s report further stated that “Walden University’s literature did not convey this unpredictable state of affairs.” *Exhibit 2* at 6.

In an interrogatory, Walden was asked to identify every graduate of its doctoral psychology program who had obtained a license to practice psychology in the United States. *See Exhibit 3* (*Defendant’s Responses and Objections To Plaintiff’s Interrogatories and Requests For Production* dated February 26, 2009) at 9. In its answer, Walden was only able to identify *five* graduates of its Professional Psychology Program who had ever obtained a license to practice psychology. *Id.*

---

[3]     Connecticut General Statutes § 20-188 provides: “[a]pplicants shall graduate from an educational program approved by the board with the consent of the Commissioner of Public Health.”

It is obvious that Walden's entire Professional Psychology Program was utterly incapable, at all relevant times, of producing professional psychologists, and therefore could not offer Johnson any of the courses necessary to obtain his stated goal of achieving a career as a practicing psychologist.   At minimum, genuine issues of fact exist as to the first *Gupta* exception.

    ii.    Genuine Issues Of Fact Exist As To Whether Walden Failed To Fulfill a Specific Contractual Promise Distinct From Any Overall Obligation To Offer a Reasonable Program.

At page 20 of its *Memorandum*, Walden argues that "[a]s to the second *Gupta* category, Plaintiff has not identified any specific contractual promise which Walden failed to fulfill", and that "Plaintiff cannot identify any writing that supports the existence of this alleged "contract…."

In *Johnson v. Schmitz*, 119 F. Supp.2d 90, 93 (D. Conn. 2000) the court stated:

> [t]he basic legal relation between a student and a private university or college is contractual in nature. There seems to be no dissent from [the] proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution. Although the Connecticut courts do not appear to have considered whether these documents are part of the educational contract, the Connecticut Supreme Court has given no indication it would not agree with the courts that have done so. Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises, consistent with the limitations expressed in *Gupta*…appears sound.

*Citations, quotations omitted*. "[W]here a breach of a specific, identifiable promise is alleged [in an educational setting], courts have found such a claim actionable." *Johnson v. Schmitz*, 119 F. Supp.2d 90, at 96. A recent Connecticut Superior Court decision expressly followed this holding (*Osberg v. Yale University*, 2009 Conn. Super. LEXIS 473 at 8-9, in which the court denied a motion to strike a breach of contract claim which was based on allegations of promises made in the defendant university's bulletin).

Here, Walden made specific promises to Johnson that its Professional Psychology Program would prepare him for a career as a practicing psychologist which, because of the nature of the

coursework and the lack of relevant accreditation, was virtually impossible for any graduate of the program to obtain. When Johnson began his doctoral work, Walden gave him a *Psychology Student Handbook,* which began as follows:

Memorandum for all Walden Students

> This handbook is the primary guide for your journey through the Walden program. It is designed to be a companion piece to the catalog, providing the supplemental details necessary to facilitate your work. Please study it carefully, and keep it handy for ready reference. It is not the only source of information available to you, but it is the touchstone.

*Affidavit* ¶ 18, *Exhibit C* at 3. The *Handbook* went on to describe Walden's Professional Psychology Program as divided into "seven professional specializations": academic psychology, clinical psychology, counseling psychology, health psychology, organizational psychology, school psychology, and sport psychology. *Affidavit* ¶ 19, *Exhibit C* at 4.

Without differentiating between the various specializations within the program, the *Handbook* set forth the following mission statement, for the entire Professional Psychology Program:

> [t]he mission of the Professional Psychology Program (PPP) at Walden University is *to prepare practicing psychologists* who can address important social problems that impact the lives of individuals, families, and organizations. Our nationally accredited curriculum emphasizes theoretical and research-derived knowledge and clinical skills that *prepare psychologists* to function as change agents in their areas of specialization. The faculty believes it is *the responsibility of psychologists* to contribute to the improvement of society in ways appropriate to their roles and responsibilities.

*Affidavit* ¶ 20, *Exhibit C* at 4 (emphases supplied). The *Handbook* also set forth, again without differentiating between the various specializations within the program, the following requirement:

> [t]he first document new psychology students develop is the Professional Development Plan (PDP). The PDP is a narrative description of your personal and professional background and the factors that contributed to your decision to pursue doctoral study in professional psychology....Along with the Plan of Study, the PDP is submitted to your Faculty Mentor (FM) as a means of introducing you to your FM. Your FM is thereby able to appreciate *your* history and *future aspirations as a professional psychologist*....

11

*Affidavit* ¶ 21, *Exhibit C* at 15 (emphasis supplied). The *Handbook* then set forth, again without differentiating between the various specializations within the Professional Psychology Program, the following topic which should be included by the new psychology student in the Professional Development Plan, under the heading "Professional Identity and Current Specialization":

> [d]escribe your career goals for the next five years. Include in this discussion how you intend to practice as a psychologist, in which state(s) you will seek a psychology license (if applicable), and in what kind of settings you wish to practice.

*Affidavit* ¶ 22, *Exhibit C* at 16 (emphases supplied).[4]

Accordingly, the *Handbook*, which described itself as the "primary guide" and the "touchstone" for the entire Professional Psychology Program (*Affidavit* ¶ 18, *Exhibit C* at 3), promised, to *all* students in the Professional Psychology Program, that Walden would prepare them as practicing psychologists, and would provide them with a Faculty Mentor who would become familiar with their aspirations and guide their future aspirations as professional psychologists.

Incredibly, Walden nonetheless contends that Johnson "has not identified any specific contractual promise which Walden failed to fulfill" (Defendant's *Memorandum at 20*). These are highly specific promises, which are also highly false, given, as discussed above, that in most situations it is a criminal offense to practice psychology or hold oneself out as a psychologist without a license, and that graduates of Walden's Professional Psychology Program are, except in extraordinary circumstances, unqualified for licensure.

Although, as Walden points out (in its *Memorandum at* 18), the *Handbook* also described both sport psychology and health psychology as non-licensure specializations (*see Exhibit C* at 19), nowhere

---

[4]     Interestingly, handbooks and catalogues published by Walden for the academic years 2000-2001 and beyond deleted the pervasive and undifferentiated use of the term "psychologist". This is evidenced by copies of these later publications appended as Exhibits to the *Affidavit of Denise M. DeZolt, Ph.D.,* filed by Walden in support of its *Memorandum*. However, by mid-2000 Johnson had completed his core curriculum, and was working on his dissertation instead of selecting discrete courses, and so did not view these later publications. *Affidavit* ¶ ¶ 49-51.

does the *Handbook* describe the practical significance of obtaining licensure, or the lack thereof, and Walden has not even attempted to show that, at any pertinent time, Johnson understood or appreciated the significance. As Dr. Steinberg stated in his report:

> [Walden] did not fully communicate the adverse licensure-related implications of non-accreditation by the APA and non-designation by the ASPPB/National Register. Although information pertaining to those implications is…freely available on the Internet and from licensing boards, an individual's ability to effectively utilize such information depends upon 1) being able to access it, i.e. 'knowing what questions to ask', and 2) having an adequate conceptual frame of reference for gauging its significance. That Walden transferred this non-trivial burden to prospective graduate students brings to mind the…ASPPB comment that "The concept of caveat emptor, or buyer beware, is considered an unsound maxim when the consumer of services cannot be sufficiently informed to beware."

*Exhibit 2* at 10.

This observation becomes particularly trenchant when it is considered that, at the time of his acceptance to Walden, Johnson was a serviceman stationed on the far side of the globe, balancing two jobs, the commitment of being a single parent, and now, a commitment to a doctoral program. *Affidavit* ¶ 27. Johnson had no independent understanding of the significance of licensure to the practice of psychology, he did not have time to investigate the subject, and he had no reason to doubt the promises of the *Handbook* that he would be qualified to become a practicing psychologist upon completion of Walden's Professional Psychology Program. *Affidavit* ¶ 28.

To borrow a phrase from Dr. Steinberg, Johnson lacked an "adequate conceptual frame of reference" (*see Exhibit 2* at 10) for gauging the significance of the references to licensure and non-licensure track specializations contained in the *Handbook*. At best, Walden has raised a question of fact as to the reasonableness of Johnson's reliance on its false representations.

As discussed next, approximately a year after Johnson's acceptance, Walden made additional false representations through an employee/agent, John E. Anderson, Ph.D., Johnson's Faculty Mentor, which were substantially the same in content, but were addressed to Johnson individually.

As part of his Professional Development Plan, Johnson filled out a Personal Goal Statement (*Exhibit B*), which was submitted to Walden on or about September 19, 1997, and which put Walden on notice that Johnson's professional goal and reason for enrolling in Walden's Professional Psychology Program was to work with clients as psychologist with clients. *Affidavit* ¶ 30.

Despite the *Handbook's* promise that new students would be assigned a Faculty Mentor "qualified to guide students in the specialization to which the student has been admitted" (*Exhibit C* at 11), Becky Copper, a Walden counselor, later admitted, in an internal memo: "I believe the Sports Psychology program was misrepresented in some ways as we did not have enough faculty members with that background." *Affidavit* ¶ 35, *Exhibit 4*. In September 1998, a full year after Johnson filled out his Personal Goal Statement to be given to his Faculty Mentor, Walden appointed John E. Anderson, Ph.D., a practicing sport psychologist, as Johnson's Faculty Mentor, who later testified, in his deposition, that before he arrived Walden had no faculty with a sport psychology background. *Affidavit* ¶ 36, *Exhibit 5* (*Deposition Of John E. Anderson, Ph.D.*) at 32.

Not only did Dr. Anderson fail to correct Walden's earlier false promises and misrepresentations, he advised Johnson that he (Johnson) would not need a license to practice sport psychology, which Dr. Anderson called an unregulated field, and that Johnson could become a practicing psychologist, like himself, through Walden's sport psychology specialization. *Affidavit* ¶¶ 38-39.

In his deposition, Dr. Anderson was asked the following question by Walden's counsel: "Doctor, the phrase was used there of practicing psychologist. What do you mean by that? What do you understand practicing psychologist to refer to?" *Exhibit 5* at 46-47. Dr. Anderson answered: "[a] psychologist that's licensed in their state of choice that's engaged in the practice of psychology." *Exhibit 5* at 47.

Dr. Anderson's deposition testimony corroborates Johnson's recollection that Dr. Anderson advised him that he could become a practicing psychologist by completing Walden's sport psychology specialization:

> A.      …as I recall, Greg, his interest was in being a sport psychologist. And, you know, he obviously felt he could accomplish that through Walden.
>
> Q:      And did you think any differently?
>
> A:      I had no reason not to, no.
>
> …Q:   Do you recall ever telling Greg or having a discussion with him that he may have been in a program that was not appropriate to meet his goals of being a practicing sports psychologist?
>
> A:      I don't recall saying that, no.

*Exhibit 5* at 25-26. It appears that Dr. Anderson may have received inadequate supervision from Walden, as reflected by the following testimony:

> Q:      Did you have a supervisor at Walden?
>
> A.      I don't know that I had a supervisor, per se. You know, there's somebody that was—looked at your syllabus. And I can't remember anybody direct me to, you know, do this, do that. I submitted what I felt was a viable initiative for sports psych and away we went.

*Exhibit 5* at 20. It also appears that Walden gave Dr. Anderson inadequate information concerning its psychology curriculum, including with respect to the purported distinction between licensure and non-licensure track specializations, as reflected by the following testimony:

> Q:      …During the time you were employed at Walden, did you have any knowledge of any distinction between licensure and nonlicensure specializations in Walden's psychology program?
>
> A:      No.

*Exhibit 5* at 47-48. To the extent that Walden inadequately supervised Dr. Anderson and failed to give him adequate training and information concerning its curriculum, it cannot be argued that Dr. Anderson

was acting outside of the scope of his employment when he made the additional false representations to Johnson.

Johnson's understanding of the significance of licensure with respect to his career plans was wholly derived from Dr. Anderson's statements on the subject. *Affidavit* ¶ 41. Dr. Anderson confirmed Johnson's incorrect understanding, originally derived from the *Handbook*, that he could become a practicing psychologist by completing Walden's Professional Psychology Program and, from that point on through the end of Johnson's doctoral studies in 2007, Walden's accreditation status, licensure, and any purported distinction between licensure and non-licensure track specializations were not issues in Johnson's mind. *Affidavit* ¶¶ 40, 42.

After just one semester at Walden (the fall semester of 1998), Dr. Anderson left his position because Walden's on-line format did not fulfill his preference for face-to-face interaction with students. *See Exhibit 5* at 13, 16. Perhaps because, as Dr. Anderson testified, "the sports psychology program, I think I was it" (*Exhibit 5* at 25) and "there certainly weren't enough [other] faculty members to constitute a program in sports psychology" (*Exhibit 5* at 41), Walden's sport psychology specialization ended with his departure (*see also Affidavit* ¶ 43). So, a year into his doctoral work, and having already made a significant investment of time and money, Johnson was forced to switch to a different area of specialization, in order to continue in the Professional Psychology Program. *Affidavit* ¶ 44.

Dr. Hilda Glazer, who was appointed Johnson's Interim Faculty Mentor upon Dr. Anderson's departure, told Johnson that he could meet his career goal of becoming a practicing sport psychologist by transferring to Walden's health psychology specialization (also designated a non-licensure specialization), which had a core curriculum which was substantially identical to that of the sport psychology specialization. *Affidavit* ¶¶ 45-46.

Based on that representation (also false), Johnson switched to the health psychology specialization. *Affidavit* ¶ 47. In mid-2000 he completed the core curriculum courses (*Affidavit* ¶ 47) and, from that point in time until late 2006 he worked on his dissertation (*Affidavit* ¶ 48). On or about November 29, 2006, after almost nine years of work and expense, Johnson completed his dissertation. *Affidavit* ¶ 52.

At no time during this period did Johnson have any reason to question the false representations that had been made to him (*Affidavit* ¶ 53), but, obviously, they were the reason he was toiling. And despite having the obligation (as discussed more fully below) and many opportunities to do so neither Walden nor its employees (including Johnson's Faculty Mentor and a 4-person dissertation committee) corrected those misrepresentations. *Affidavit* ¶ 54-55.

On February 2, 2007, Johnson obtained a Ph.D. from Walden University. *Affidavit* ¶ 58. Upon obtaining his degree, Johnson applied for several jobs to work with clients as a psychologist, but he was rejected because he did not have a psychology license. *Affidavit* ¶ 58. Johnson then attempted to sit for Connecticut's psychology licensing examination, but Connecticut rejected his application to take the examination because Walden lacked relevant accreditation (*Affidavit* ¶ 60), as explained in Dr. Steinberg's report and discussed above. Johnson has suffered harm, as a direct result of Walden's false representations, in the form of almost a decade's worth of tuition and other expenses, lost earnings for the remainder of his working life, and lost time and opportunity. *Affidavit* ¶ 61.

It is obvious from the above evidence that Walden failed to fulfill a specific contractual promise it made to Johnson which was distinct from any overall obligation it had to offer a reasonable educational program. At minimum, genuine issues of fact exist as to the second *Gupta* exception.

17

B.    Genuine Issues Of Fact Exist As To Whether Johnson's Claims Are Barred By Connecticut's Statute Of Frauds.

Walden also argues that the alleged contract violates subsection (a)(5) of Conn. Gen. Stat. § 52-550, Connecticut's Statute of Frauds, because "the contract could not possibly have been performed in less than a year", "[g]iven the mandatory course and dissertation requirements for obtaining a doctoral degree in psychology at Walden…."[5]

While Walden is correct that its Professional Psychology Program was not designed to be completed in less than a year, it is also true that Walden did not require its students to complete the program within a definite time frame (*see*, *e.g. Exhibit C* (the *Handbook*) at 25, which describes projected graduation dates as varying with the timing of the student's filing of a "declaration of intent to graduate").

In *C.R. Klewin, Inc. v. Flagship Properties, Inc., et. al.*, 220 Conn. 569, 572-573 (1991) the Connecticut Supreme Court answered the following question, which had been certified to it by the United States Court of Appeals for the Second Circuit: "[w]hether under the Connecticut Statute of Frauds, Conn. Gen. Stat. § 52-550(a)(5), an oral contract that fails to specify explicitly the time for performance is a contract of 'indefinite duration,'…and therefore outside of the Statute's proscriptions?" The Supreme Court answered that question as follows:

> [w]e…hold that an oral contract that does not say, in express terms, that performance is to have a specific duration beyond one year is, as a matter of law, the functional equivalent of a contract of indefinite duration for the purposes of the statute of frauds.

---

[5]    Connecticut's Statute of Frauds, Conn. Gen. Stat. § 52-550, provides, in pertinent part: "(a) *No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party to be charged:* (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default, or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest concerning real property; *(5) upon any agreement that is not to be performed within one year from the making thereof*; or (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars."

Like a contract of indefinite duration, such a contract is enforceable because it is outside the proscriptive force of the statute regardless of how long completion of performance will actually take.

*Klewin,* 220 Conn. at 583-584.[6]

As discussed above, there was no fixed date for completion of the Professional Psychology Program, and each student could change his or her graduation date, depending on when the dissertation was completed. Accordingly, it cannot be disputed that Walden's Professional Psychology Program was one of indefinite duration. Since Connecticut's highest court has definitively held that such contracts are outside of the ambit of Conn. Gen. Stat. § 52-550(a)(5), and since there is, quite clearly, no other provision of § 52-550(a) which would be applicable to the present facts, Walden's contention that Johnson's contractual causes of action are barred by the Statute of Frauds must fail. At least, there is a genuine issue of fact as to this point.

    C.    Genuine Issues Of Fact Exist As To Whether Johnson's Claims Are Barred By Applicable Statutes Of Limitation.

Walden contends that all six counts asserted by Johnson are time barred by the applicable statutes of limitations, because, according to Walden, all of his causes of action are "entirely based on alleged events occurring between 1997 and 2000", and that [a]t a minimum, all of these alleged events transpired more than seven years before the Complaint was filed in 2008." Defendant's *Memorandum* at 3.[7] However, there are genuine issues of fact as to whether Johnson's causes of action are "entirely based on alleged events occurring between 1997 and 2000" as Walden contends.

---

[6]    The *Klewin* court stated: "[b]ecause the one-year provision is an anachronism in modern life…we are not disposed to expand its destructive force."

[7]    *See also* Defendant's *Memorandum* at 10-11 (arguing that the three-year limitation period of Conn. Gen. Stat. § 52-577 bars Johnson's fraudulent misrepresentation claim), 13 (arguing that the same statute bars Johnson's negligent misrepresentation claim), 14 (arguing that the three-year limitation period of Conn. Gen. Stat. § 42-110g(f) bars Johnson's CUTPA claim), 17-18 (arguing that the six-year limitation period of Conn. Gen. Stat. § 52-576(a) bars Johnson's breach of implied contract claim), 21

Under Connecticut law, a statute of limitations may be tolled under the "continuing course of conduct" doctrine.

> [I]n order to support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong….Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, *there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act*….The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortuous acts or omissions may be difficult to identify and may yet be remedied.

*Neuhaus v. Decholnoky, et. al.*, 280 Conn. 190, 201-202 (2006).  "The gravamen of the continuing course of conduct doctrine is that a duty continues after the original wrong is committed; and that "before the doctrine can be applied, a duty must first be found to have existed." *Neuhaus,* 280 Conn. at 216.

Directly, and through its employees who were Johnson's advisers throughout his tenure at Walden, Walden had a duty to apprise itself of Johnson's career goal of becoming a practicing psychologist, and it also had a duty to inform Johnson of what it surely must have known: that, barring the extraordinary, Johnson could not possibly achieve that goal through Walden's Professional Psychology Program.

During his entire course of study with Walden, Johnson had a Faculty Mentor, who, according to the *Handbook*, had the responsibility to "appreciate [Johnson's] history and future aspirations as a professional psychologist". *Exhibit C* at 15, *Affidavit* ¶ 21. According to the *Handbook*, by familiarizing

---

(arguing that the same statute bar Johnson's promissory estoppel claim), and 22 (arguing that the three-year limitation period of Conn. Gen. Stat. § 52-577 bars Johnson's breach of implied contract of good faith and fair dealing claim).

him or herself with the student's Professional Development Plan and Plan of Study, the Faculty Mentor "and others" were to advise each student "*effectively* over the course of [the student's] doctoral study at Walden." *Exhibit C* at 15 (*emphasis supplied*).

In mid-2000, Johnson completed the core curriculum courses in the Health Psychology specialization. *Affidavit* ¶ 47. At that point, Johnson began his dissertation and, until he completed it in November 2006, he was also advised by a four-member dissertation committee, in addition to a Faculty Mentor. *Affidavit* ¶ 55. According to the *Handbook*, Walden required that "[t]he relation of the dissertation to…professional specialization should be clear and explicit…." *Exhibit C* at 30. Accordingly, during the entirety of Johnson's tenure at Walden, through its faculty, assumed responsibility for an ongoing awareness of Johnson's professional goals as well as the responsibility of continually monitoring his progress toward those goals.

"If one takes charge and control of a situation, he is regarded as entering into a relation which is attenuated with responsibility." *McClure v. Fairfield University*, 2003 Conn. Super. LEXIS 1778 at 17. *Citation, quotation omitted*. In *Johnson v. Schmitz*, 119 F. Supp.2d 90, 97-98 (D. Conn. 2000), this Court stated:

> [g]iven the collaborative nature of the relationship between a graduate student and a dissertation advisor who necessarily shares the same academic interests, the Court can envision a situation in which a graduate school, knowing the nature of this relationship, may assume a fiduciary duty to the student. In light of the Connecticut Supreme Court's disinclination to confine the reach of the fiduciary duty doctrine by precise definition and its willingness to allow for case-by-case analysis in new situations, this Court concludes that more factual development is warranted in this case. Yale allegedly represented that it would safeguard its students from faculty misconduct and provide a nurturing environment for its students. Plaintiff may further develop such factual issues as Yale's representation of its mission towards graduate students, and whether or not it represented that it would take care of graduate students to the exclusion of all others. Because this inquiry is factually dependent, the determination of whether Yale owed a fiduciary duty to Johnson must await at least the summary judgment stage.

*Id.* at 97-98.

A motion for summary judgment alleging a statute of limitations defense requires the court to "determine if there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the original wrong; and (3) continually breached that duty." *Witt v. St. Vincent's Medical Center*, 252 Conn. 363, 370 (2000). Here, as indicated above, all three prongs of this test clearly existed, with (2) and (3) continuing at least until Johnson's completion of his dissertation in November, 2006.

With respect to contract-based causes of action, the standard for applying the continuing course of conduct doctrine is higher, and requires a showing of more than "the continuing failure to perform a single required act", that "there is something tantamount to a fraudulent concealment of a cause of action" or that the violation must continue to evolve after the initial act complained of is completed. *See* discussion in *Shea v. Town of West Hartford*, 2009 Conn. Super. LEXIS 839 at 18.

Here, the evidence indicates that the false representations which Walden made to Johnson were part of a larger scheme to gloss over, spin, cover up, or outright lie about the inadequacies of the entire Professional Psychology Program and the disability of every student in it to either sit for licensure or obtain a career as a practicing psychologist, the central mission of the program.

The evidence reflects that this broad scheme was in existence from Johnson's very first contact with Walden, in which Sandra Flack's letter to him promised, falsely, a "professionally relevant program" (*Affidavit* ¶ 11, *Exhibit 1*) to January 26, 2006 (in the very year in which Johnson finished his dissertation) on which date Walden published, on its website, a gross mischaracterization of the impact of the accreditation status of its psychology program on the ability of graduates to obtain licensure:

> On 26 Jan 2006, Walden University conducted a question-and-answer forum regarding psychology licensure….Although it was acknowledged that Walden University licensure specializations were not accredited by the APA, such accreditation was said to be a requirement for licensure in only "some states" and the impact of non-accreditation was described as "highly subjective and depends on the individual in pursuit of the degree". In response to "Why are you not pursuing APA accreditation?", it was stated "It is not in

> our best interest at this time. The program meets the standards of the APA and meets licensure requirements in many states." In fact, without APA accreditation and/or ASPPB/National Register designation, the Walden licensure specializations produced graduates who could not routinely sit for the [national examination] in 8/10 states.

*Exhibit 2* at 6.  In his expert report, Dr. Steinberg also opined that Walden's assertion, made in the "forum" "that "APA accreditation would mean foregoing many…(non-Western) areas of study" is patently inaccurate" (*Exhibit 2* at 7), and that Walden's contention "that APA accreditation would necessarily impose an unworkable reduction in access to the program, likewise appears specious" (*Exhibit 2* at 8).   Between these temporal endpoints, Walden's representations as to certain specializations within the program "did not fully communicate the adverse licensure-related implications of non-accreditation of the APA and non-designation by the ASPPB/National Register." *Exhibit 2* at 10.

The statements made to Johnson were part of a fraudulent pattern of intentional misrepresentations by Walden that occurred from the date of Walden's first contact with Johnson, through the date the present *Complaint* was filed. The requirement of the most stringent iteration of the continuing course of conduct doctrine, *i.e.*, "something tantamount to a fraudulent concealment of a cause of action" is, here, easily met.

None of the limitation periods cited by Walden have run. None of the six counts brought by Johnson are time-barred by their applicable statutes of limitation. At minimum, genuine issues of fact exist as to that issue.

D.     Genuine Issues Of Fact Exist As To Whether Walden's Acts and Omissions Constitute An Unfair Trade Practice Within the Meaning of Conn. Gen. Stat. § 42-110a *Et. Seq.*

At page 15 of its *Memorandum*, Walden argues that "[t]he          incontrovertible          evidence demonstrates that Walden did nothing that would constitute an unfair trade practice", in that it allegedly "conspicuously and continuously described the sport and health psychology specializations as not being intended for students seeking state licensure as psychologists." However, as discussed above, the

evidence also demonstrates that Walden also conspicuously touted its entire Professional Psychology Programs, including its "non-licensure" specializations, as designed to prepare practicing psychologists, representations that were false.

Connecticut General Statutes § 42-110b(a) provides: "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Connecticut's Supreme Court has held that medical and attorney malpractice actions under CUTPA are generally barred, except to the extent that the physician or attorney is engaging in the entrepreneurial, commercial, or business aspects of the practice. *See Haynes v. New Haven Hospital*, 243 Conn. 17 at 36-37, *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 656 (2004).

In *Osberg v. Yale University*, 2009 Conn. Super. LEXIS 473 at 14-15, the court noted:

…Connecticut appellate courts have not decided whether CUTPA claims that are premised on professional malpractice in fields other than medicine or law should be barred. A difference of opinion on this issue exists in the Connecticut Superior Court. Assuming, without deciding, that the bar should be extended to CUTPA claims that are premised on professional malpractice in the educational context, the allegations of the plaintiff in the present case implicate the entrepreneurial aspects of the defendant's provision of educational services and, therefore, fit into the limited exception to that rule.

It is self-evident that many of the false statements at issue were motivated by a commercial purpose and, therefore, come within the ambit of CUTPA.

E.      Genuine Issues Of Fact Exist As To Whether There Exists a Factual Nexus Between Connecticut and the Subject Acts and Omissions Of Walden So As To Violate Conn. Gen. Stat. § 42-110a Et. Seq.

At page 16 of its *Memorandum*, Walden notes, correctly, that CUTPA seeks to proscribe unfair or deceptive acts or practices in Connecticut. However, Walden then argues:

…given that Plaintiff lived in Japan: (i) when he enrolled in Walden, (ii) when he was allegedly advised by Dr. Anderson regarding licensure issues, (iii) when he selected the sport psychology specialization, and (iv) when he selected the health psychology specialization, there is absolutely no factual nexus between Connecticut and any of the alleged improper actions by Walden that could conceivably constitute trade or commerce. Plaintiff moved to Connecticut a full year after changing to the health psychology

24

specialization. The fact that Plaintiff was a Connecticut resident during the years he finished his degree is insufficient to make CUTPA applicable to alleged actions that predated his residency in this state.

*Defendant's Memorandum* at 16-17.

During that time, however, as discussed above, Johnson's faculty mentors and dissertation committee members had a continuing duty, as discussed above, and perhaps a fiduciary obligation, to ensure that Johnson's course work met his career objectives. As also discussed above, Walden engaged in a pattern of concealment and fraudulent misrepresentations throughout the period. At minimum, genuine issues of fact exist as to whether there was a nexus between Connecticut and the actions complained of, for purposes of CUTPA.

F.      Genuine Issues Of Fact Exist, At Minimum, As To Johnson's Promissory Estoppel Claim.

At page 21 of its *Memorandum*, Walden cites, correctly, *Connecticut Nat'l Bank v. Voog*, 233 Conn. 352, 366 (1995) for the proposition that "a person who claims an estoppel must show that he exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." However, Walden then argues: "Plaintiff cannot possibly claim that he did not know the true state of things that health psychology was a non-license specialization." *Defendant's Memorandum* at 22.

This argument completely misses the point. As discussed above, *all* of the specializations were, in truth, "non-licensure". Although Walden's labeling of the specializations may evidence Walden's intent to deceive its students, Johnson's claims are based upon Walden's misrepresentations to him that the Professional Psychology Program would prepare him for a career as a practicing psychologist, regardless of specialization. Johnson has easily shown that he changed his position in reliance on those representations, or has at least demonstrated the existence of a genuine issue of fact on this point, by completing the psychology program at the great expense, based in the representations. *See Affidavit* ¶ 60.

25

G.      Genuine Issues Of Fact Exist, At Minimum, As To Johnson's Breach of Implied Covenant of Good Faith and Fair Dealing Claim.

At page 23 of its *Memorandum*, Walden cites, correctly, *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 783 (2000) for the proposition that "a claim for breach of the covenant of good faith and fair dealing can only be made where a contract exists between the parties." However, Walden then argues that "there is no evidence that the alleged contract between Walden and Plaintiff ever existed…."

As already discussed, however, "[t]he basic legal relation between a student and a private university or college is contractual in nature. There seems to be no dissent from [the] proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution. *Johnson v. Schmitz*, 119 F. Supp.2d 90, 93 (D. Conn. 2000). There is no merit to Walden's argument in this regard either, or, at least, a genuine issue of fact exists to contravene it.

26

IV.   Conclusion.

Although not directly addressed by Walden's *Memorandum*, the parties' intent or state of mind informs many of the issues in this case, in particular, whether Walden acted with fraudulent intent with respect to its long-standing pattern of concealment and misrepresentations concerning the *bona fides* of the Professional Psychology Program.Questions of the parties' intent are not suitably resolved on motions for summary judgment. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 71 (2d Cir. 2008).

For this, and for all of the above reasons, Walden's *Motion for Summary Judgment* should be denied.

Dated at Avon, Connecticut this 5th day of June, 2009.

PLAINTIFF,

By /s/ Edward P. Jurkiewicz_____
Edward P. Jurkiewicz  ct04779
Lawrence & Jurkiewicz, LLC
30 East Main Street
Avon, CT  06001
Telephone:  (860) 677-6416
Fax:  (860) 677-5005
edwardjurkiewicz@sbcglobal.net
His Attorney

27

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

_____
GREG V. JOHNSON                                    :
           Plaintiff                        : CIVIL ACTION NO.
                                       : 3:08-CV-00045 (DJS)
V.                                                 :
                                                   :
WALDEN UNIVERSITY, INC.                            :
           Defendant                        : JUNE 5, 2009
_____:

**CERTIFICATE OF SERVICE**

       I hereby certify that, on June 5, 2009, a copy of Plaintiff's *Memorandum In Opposition To Motion For Summary Judgment*, together with the Plaintiff's *Local Rule 56(a)2 Statement*, *Affidavit of Greg V. Johnson*, and *Exhibits 1, 2, 3, 4, and 5* were filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                          /s/ Edward P. Jurkiewicz_____
                          Edward P. Jurkiewicz    ct04779
                          Lawrence & Jurkiewicz, LLC
                          30 East Main Street
                          Avon, CT 06001
                          (860) 677-6416(telephone)
                          (860) 677-5005 (fax)
                          edwardjurkiewicz@sbcglobal.net