.UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GREG V. JOHNSON                          :
      Plaintiff,                    :
                                        :
v.                                       :          CIVIL ACTION NO. 3:08CV00045 (DJS)
                                        :
WALDEN UNIVERSITY, INC.                  :
      Defendant.                    :

MEMORANDUM OF DECISION AND ORDER

      The Plaintiff, Greg V. Johnson ("Johnson"), brings this diversity action against the

Defendant, Walden University, Inc. ("Walden"), raising claims of fraudulent misrepresentation,

negligent misrepresentation, violation of the Connecticut Unfair Trade Practices Act

("CUTPA"), breach of implied contract, promissory estoppel, and breach of implied covenant of

good faith and fair dealing.  Now pending before the court is Walden's summary judgment

motion on all counts. For the reasons set forth below, the motion for summary judgment **(dkt. #

26)** is **DENIED.**

I.  FACTS

      Walden is a for-profit corporation organized under the laws of the State of Florida with a

principal address of 650 South Exeter Street, Baltimore, Maryland.  Walden is an institution of

higher education and offers its students a distance-learning environment in which many of its

programs are taught either completely or partially online.

      In 1996 Johnson, who was serving in the United States Marine Corps stationed in

Okinawa, Japan, obtained leaflets concerning Walden's online education from an educational

service center on a U.S. military base in Okinawa.   Johnson, who was anticipating his discharge from the Marine Corps,  subsequently requested and received from Walden additional information concerning a doctoral course in psychology. He had previously received a bachelor's degree in psychology and his career goal at that time was to become a practicing psychologist. Johnson also ran a part-time massage therapy business in Okinawa and was a single parent raising four children.

In 1997 Johnson applied to the Walden Professional Psychology Program ("Program") to pursue a doctorate in psychology with a specialization in sports psychology.  In a document entitled "My Personal Goal Statement" he indicated that "[m]y long range goal is to have a for-profit hospital add an alternative care unit (Therapeutic massage) or wing onto their hospital," and that "my short range scholarly goal is to finish my degree, so I can give better service and advice to recipients of my therapy." (Dkt. # 27-3, at 4.)  Walden subsequently accepted Johnson into its Program.

Johnson enrolled in Walden's Program in 1997. At or around the time of his enrollment, Johnson was given a Psychology Student Handbook ("Handbook") describing the Program.  In a prefatory statement, Walden students were advised that the Handbook "is not the only source of information available to you, but it is the touchstone."  (Dkt. # 27-4, at 3.) According to the Handbook, "[t]he mission of the Professional Psychology Program (PPP) at Walden University is to prepare practicing psychologists who can address important social problems that impact the lives of individuals, families, and organization." (*Id.* at 4.)

The Handbook described the role and significance of a "Faculty Mentor" as follows: "[t]he Faculty Mentor (FM) is your advisor, coach, and colleague who will guide you through the

-2-

journey of your academic studies.  The FM is the primary contact throughout the academic program . . . . The Division Chair assigns new students to a Faculty Mentor (FM) qualified to guide students in the specialization to which the student has been admitted.  Assignments are made at the point of the admission interview after a careful assessment of the student's background and professional goals." *(Id*. at 11.)

At the time of Johnson's enrollment, Walden's Program offered seven professional specializations: academic psychology, clinical psychology, counseling psychology, health psychology, organizational psychology, school psychology, and sports psychology. These seven professional specializations were divided into two categories: "(1) to prepare graduates to apply to state psychology boards for a license to practice psychology (clinical, counseling, and school psychology), and (2) to prepare graduates to teach psychology, work in business/industry, seek positions in health care settings, or work as consultants." *(Id.* at 17-18.) "Clinical, counseling, and school psychology are specializations designed to prepare graduates for licensure as a psychologist." (*Id.* at 18.)  Under the heading "Nonlicensure-Oriented Specializations," the Handbook indicated that "[a]cademic, health, organizational, and sport[s] psychology are specializations designed to prepare graduates for positions in academic settings, health care environments, athletic settings, and business/industry." (*Id.* at 19.)  "Students specializing in clinical, counseling, and school psychology are required to complete PSYC 8280: Practicum, and PSYC 9100: Internship, in settings appropriate to the student's specialization and the requirements of the appropriate state psychology board . . . . Students specializing in academic, health, organizational, and sports psychology are not required to complete a practicum or internship." (*Id.* at 23.)

John E. Anderson, Ph.D. ("Dr. Anderson") taught an online sports psychology course at Walden during the fall semester of 1998. Effective September 1, 1998, Dr. Anderson became Johnson's Faculty Mentor. At various times, Johnson conversed with Dr. Anderson about Johnson's career goals and how to achieve those goals. Johnson also contacted Dr. Anderson with any questions or concerns Johnson had relating to the provisions of the Handbook. Johnson "asked [Dr. Anderson] what was required of me to become a practicing psychologist, and that's what he guided me into." (Dkt. # 27-2, at 15.) Johnson relied upon representations made by his Faculty Mentor, Dr. Anderson, that Johnson could become a practicing psychologist through Walden's sports psychology specialization. "The first conversation with Dr. Anderson was during the time when I got him as a mentor. I asked him about becoming a sports psychologist and can this Walden University help me to become a sports psychologist. His reply was: Yes. As a sports psychologist licensed, yes . . . . My understanding was Dr. Anderson was assigned to me to be a mentor to guide me through the program. And by the fact of being a mentor as a sports psychologist himself, I relied on his comments and understanding to help me get through this course as a guide to become a licensed sports psychologist ." (*Id.* at 14.)

According to Dr. Anderson, a "practicing psychologist" is "[a] psychologist that's licensed in their state of choice that's engaged in the practice of psychology." (Dkt. # 33-3, at 7.) Dr. Anderson understood that Johnson's interest "was in being a sports psychologist. And, you know, he obviously felt he could accomplish that through Walden." (Dkt. # 33-2, at 5-6.) Dr. Anderson further indicated that he had no reason to think any differently about whether Johnson could achieve his goal through Walden and that he had no recollection of telling Johnson that he may

have been in a program that was not appropriate to meet his goal of becoming a "practicing sports psychologist." (*Id.* at 6.)

In 1999 Johnson changed his specialization from sports psychology to health psychology. This change resulted from the discontinuation of the sports psychology specialization at Walden. Johnson chose health psychology after speaking with his interim Faculty Mentor, Hilda Glazier, "due to the fact that it resembled sports psychology." (Dkt. # 27-2, at 16.)  Dr. Anderson, who did not teach at Walden after the fall 1998 semester, recalls having "some kind of follow-up" with Johnson after that semester was over "just to ensure that Greg was moving acceptably down a path.  He had - - he was moving into that, I believe, it was health psych from sports psych."  (Dkt. # 33-3, at 2, 4.)  It was Dr. Anderson's impression at the time of this follow-up contact that Johnson still wanted to be a practicing psychologist and he does not recall telling Johnson that the health psychology program would not be suitable for meeting that goal. (*Id.* at 6.)  Johnson knew that "health psychology and sports psychology were similar in content and classes."  (Dkt. # 27-2, at 16.)   Based on information he had previously received from Dr. Anderson, Johnson concluded that the health psychology specialization "would actually get me still to be a practicing psychologist but in a different form."  (*Id.*)

Johnson completed his course work in 1999.  From the spring of 2000 until the fall of 2006 he was doing work relating to his dissertation.  These activities are variously described by Walden  in Johnson's Academic Record as "Dissertation," "Field Studies," and "Continuing Research."  (Dkt. # 27-7, at 3-5.)  Walden subsequently awarded Johnson a doctorate degree in psychology with a specialization in health psychology.

In January 2000 Johnson retired from the United States Marine Corps and relocated to Atlanta, Georgia.  Later that year he moved to Connecticut.  In 2007, after he had received his Walden doctorate, Johnson was advised by an agent of the State of Connecticut that he would not be permitted to sit for Connecticut's psychology licensing examination because Walden lacked the necessary accreditation. Without a license to practice psychology issued by the State of Connecticut, Johnson cannot practice psychology in Connecticut.  *See* Conn. Gen. Stat. § 20-187a ( "No person shall practice psychology unless he has obtained a license [from the State of Connecticut].").

## II.  DISCUSSION

A.  Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In determining a summary judgment motion, "[t]he Court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004)(internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Mafffucci,* 923 F.2d 979, 982 (2d Cir. 1991).

"The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Industry Insurance*

*Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)).  "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'"  *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute concerning a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Aldrich v. Randolph Central School District*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248).

While the nonmoving party may not rest upon mere conclusory allegations or denials to defeat a summary judgment motion, "[s]ummary judgment is inappropriate when the admissible materials produced in opposition to the summary judgment motion make it arguable that the claim has merit."  *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009)(internal quotation marks omitted).  In considering a summary judgment motion, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

B.  Choice of Law

Federal jurisdiction in this case is based on diversity of citizenship between the parties.  A federal court sitting in diversity applies the law of the forum state.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  That rule also applies to the laws and rules governing the choice of law to apply when that choice is uncertain.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  Both parties have cited Connecticut law to support their respective positions and therefore accept the application of the law of the forum state.

C. Statutes of Limitations

Walden argues that because all of the conduct at issue in the complaint occurred in the

year 2000 or earlier and the Complaint was not filed until 2008,  all of Johnson's claims are time

barred under the statutes of limitations applicable to those claims, i.e., Conn. Gen. Stat. § 52-577

(the three year statute of limitations applicable to tort claims), Conn. Gen. Stat. § 42-110g (the

three year statute of limitations applicable to CUTPA claims), and Conn. Gen. Stat. § 52-576(a)

(the six year statute of limitations applicable to contract claims). Johnson in turn contends that the

applicable statutes of limitations were tolled by the continuing course of conduct doctrine, or that,

at a minimum, genuine issues of fact exist as to whether the continuing course of conduct applies.

As further articulated below, the court concludes that Walden is not entitled to summary judgment

on the basis of the applicable statutes of limitations.

i. Tort and CUTPA Claims

The plaintiff's complaint asserts claims of fraudulent misrepresentation (Count I),

negligent misrepresentation (Count II), and a violation of  CUTPA (Count III). Conn. Gen. Stat. §

52-577, which is Connecticut's general tort statute of limitations, and Conn. Gen. Stat. § 42-110g,

which is the CUTPA statute of limitations, are both "occurrence statute[s], meaning that the time

period within which a plaintiff must commence an action begins to run at the moment the act or

omission complained of occurs." *Collum v. Chapin*, 40 Conn. App. 449, 451 (1996) (internal

quotation marks omitted); *see also Independence Insurance Service Corp. v. Hartford Life*

*Insurance Co.*, 472 F. Supp. 2d 183, 190 (D. Conn. 2007) (CUTPA limitation period is "triggered

upon the occurrence of the alleged violation, not the discovery of the alleged practice" (internal

quotation marks omitted)). The acts or omissions Johnson complains of are statements made to

him by his Faculty Mentor, Dr. Anderson, and representations made by Walden in its materials describing the Program, which statements and representations he alleges led him to believe he could become a practicing psychologist upon completion of the Walden Program. It is readily apparent that all these statements and representations were made more than three years before suit was filed in January of 2008. Thus, Johnson's claims appear to be time- barred on the face of the complaint.

Johnson argues, however, that the statutes of limitations should be tolled under the "continuing course of conduct" doctrine. Because Johnson's claims are time-barred on the face of the complaint, he bears the burden of "pleading facts sufficient to establish that the statutes of limitations should be tolled." *OBG Technical Services, Inc. v. Northrop Grumman Space & Mission Systems Corp.*, 503 F. Supp. 2d 490, 504 (D. Conn. 2007). Walden contends that the continuing course of conduct doctrine does not apply under the facts of this case, and, for that reason, all counts should remain time-barred.

Connecticut courts have recognized that "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute [Conn.Gen. Stat. § 52-577] does not begin to run until that course of conduct is completed . . . . [I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . " *Vanliner Insurance Co. v. Fay*, 98 Conn. App. 125, 140 (2006); *see also Fichera v. Mine Hill Corp.*, 207 Conn. 204, 209 (1988) (applying the same continuing course of conduct analysis to a CUTPA claim). "Where [the Connecticut Supreme Court has] upheld a finding that a

duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act . . . ." *Id.*

In determining whether the defendant's motion for summary judgment should be granted on the basis of a statute of limitations, the first consideration is whether there is a genuine issue of material fact as to whether Walden committed an initial wrong upon Johnson. A genuine issue of material fact exists if "'a reasonable [factfinder] could return a verdict for the nonmoving party.'" *United States v. Davis*, 648 F.3d 84, 91 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court concludes that a reasonable juror could find that Walden committed an initial wrong upon Johnson by virtue of statements made by Dr. Johnson and representations contained in Walden materials describing the Program.[1]

The crux of Johnson's complaint is that he was misled by Walden into believing he could become a practicing psychologist by completing the Program. More specifically, he alleges that he relied to his detriment on statements and representations made by and on behalf of Walden which led him to believe that obtaining a doctorate degree in psychology with a specialization in health psychology (or sports psychology) would enable him to become a practicing psychologist. The Walden Handbook states that "[t]he mission of the Professional Psychology Program (PPP) at Walden University is to prepare practicing psychologists who can address important social problems that impact the lives of individuals, families, and organization." (Dkt. # 27-4, at 4.) According to Dr. Anderson, who for a period of time was Johnson's Faculty Mentor, a practicing

---

[1]The court points out that by concluding that a reasonable juror *could* make such a finding, it is not predetermining that a reasonable juror *would* make such a finding.

psychologist is "[a] psychologist that's licensed in their state of choice that's engaged in the practice of psychology." (Dkt. # 33-3, at 7.)  The Walden Handbook refers to the Faculty Mentor as the student's "advisor, coach, and colleague who will guide you through the journey of your academic studies.  The F[aculty] M[entor] is the primary contact throughout the academic program . . . ." (Dkt. # 27-4, at 11.)  The Handbook further states that the assignment of a Faculty Mentor is "made at the point of the admission interview after a careful assessment of the student's background and professional goals." (*Id*.)

The court must "view the evidence in the light most favorable to the party opposing summary judgment, [] draw all reasonable inferences in favor of that party, and [] eschew credibility assessments." *Amnesty America v. Town of West Hartford,* 361 F.3d at 122 (internal quotation marks omitted). Johnson has adduced evidence that he relied upon representations made by his Faculty Mentor, Dr. Anderson, that Johnson could become a practicing psychologist through Walden's sports psychology specialization. Dr. Anderson had further contact with Johnson after Johnson had switched from the sports psychology specialization to health psychology "just to ensure that Greg was moving acceptably down a path.  He had - - he was moving into that, I believe, it was health psych from sports psych."  (Dkt. # 33-3, at  4.)  At the time of his follow-up contact with Johnson, it was Dr. Anderson's impression that Johnson still wanted to be a practicing psychologist and he does not recall telling Johnson that the health psychology program would not be suitable for meeting that goal. (Dkt. # 33-3, at 6.)  Based at least in part on his communications with Dr. Anderson, Johnson believed that the health psychology specialization "would actually get me still to be a practicing psychologist but in a different form." (Dkt. # 27-2, at 16.)  A reasonable juror could find that these facts demonstrate an

initial wrong committed by Walden upon the plaintiff.

Turning to the issue of whether the defendant owed a continuing duty to the plaintiff, "[w]here we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Sherwood v. Danbury Hospital*, 252 Conn. 193, 203 (2000). Because the plaintiff has not provided evidence of "later wrongful conduct" within three years of the filing of this action, the court focuses on whether the plaintiff has provided evidence of a "special relationship" giving rise to a continuing duty. "[G]enerally these [special] relationships have been attorney-client, physician-patient, or some related sort of fiduciary-type relationship in which one party reasonably reposes trust in the other to exercise continuing care on his behalf." *Partitions, Inc. v. Blumberg Associates, Inc.*, No. CV980576664S, 2001 Conn. Super. LEXIS 2960, at *15-16 (Conn. Super. Oct. 9, 2001).

"A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." *Albuquerque v. Albuquerque*, 42 Conn. App. 284, 287 (1996) (internal quotation marks omitted). "[E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations. It has left the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Harper v. Adametz*, 142 Conn. 218, 225 (1955). "The [Connecticut Supreme Court] seems to say

-12-

that it is fair to have the 'continuous course of conduct rule' operate where there is a fiduciary relationship or relationship between the parties so that one of the parties has an ongoing responsibility to right any wrongs he or she may have done or bring them to the injured party's attention- - the latter party relying on the relationship of trust might very well not be as attentive to protecting his or her interests, thus the rigor of the limitations statutes should be relaxed." *KGM Corp. v. Parillo*, CV044001596, 2005 Conn. Super. LEXIS 3206, at *8-9 (Conn. Super. Nov. 3, 2005) (internal quotation marks omitted).

In *Johnson v. Schmitz*, 119 F. Supp. 2d 90 (D. Conn. 2000), the plaintiff, a graduate student, filed an action that was based in part on his claim that the university he was attending had breached a fiduciary duty owed to him. The plaintiff claimed that his dissertation advisors at the university had engaged in academic misconduct by misappropriating the plaintiff's ideas.  In ruling on a motion to dismiss, the court considered the plaintiff's breach of fiduciary duty claim against the university and indicated that it could "envision a situation in which a graduate school, knowing the nature of [the relationship between the student and his dissertation advisor], may assume a fiduciary duty to the student." *Id*. at 98. In expressing this view, the court noted that the Connecticut Supreme Court "has purposefully refrained from defining a fiduciary relationship . . . in such a manner as to exclude new situations." *Id.* at 97 (internal quotation marks omitted).  The court denied the defendant's motion to dismiss the breach of fiduciary duty claim and allowed the plaintiff to conduct discovery to further develop facts relating to that claim. *Id.* at 98.

The court recognizes that *Leary v. Wesleyan University*, CV 055003943, 2009 Conn. Super. LEXIS 621 (Conn. Super. March 10, 2009) suggests that the existence of a fiduciary duty to a student on the part of a university requires a demonstration of fraud, self-dealing or conflict of

interest on the part of the university. "While the facts of the present case may be interpreted to describe a dependant relationship, unlike the facts in . . . *Johnson* [*v. Schmitz*] which included acts of fraud, misconduct or misappropriation on the part of the defendant's officers, nothing in the present case indicates that the defendant's officers engaged in such conduct. . . . The court finds that the facts of this case do not demonstrate the fraudulent, self-dealing or conflict of interest situations in which our Supreme Court has embraced an analysis for determining the presence of a fiduciary duty." 2009 Conn. Super. LEXIS 621, at *40-41 (citations omitted). The *Leary* decision relies in part on the following language from *Sherwood v. Danbury Hospital*, 278 Conn. 163, 196 (2006): "'[a]lthough we have not *expressly* limited the application of these traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations.'"(quoting *Murphy v. Wakelee*, 247 Conn. 396, 400 (1998)). The issue before the court in *Murphy*, however, was not whether there was a fiduciary relationship between the parties, but under what circumstances in a fiduciary relationship the burden shifts to the fiduciary to prove fair dealing. The court went on to find that "it is only when the confidential relationship is shown together with suspicious circumstances . . . that the burden shifts to the fiduciary to prove fair dealing. . . . Therefore, we read the burden-shifting language in our cases, not in a vacuum as the plaintiff suggests, but, rather, against the backdrop of the circumstances that raised the presumption of fraud." *Id.* at 405-06. This court does not read either *Sherwood* or *Murphy* as requiring a showing of fraud, self-dealing or conflict of interest as a prerequisite to finding a fiduciary relationship between a student and a university.

The court concludes that there is a genuine issue of material fact with respect to whether Walden owed a continuing duty to Johnson that was related to the alleged original wrong. Taken

in the light most favorable to the plaintiff, the facts show that Dr. Anderson, who was Johnson's Faculty Mentor, and, as such, was Johnson's primary contact at Walden, advised Johnson on more than one occasion that he would be able to become a practicing psychologist, meaning a licensed psychologist, by obtaining a doctorate degree from Walden in either the sports psychology or health psychology specialization. As was the case in *Johnson v. Schmitz*, this could be "a situation in which a graduate school, knowing the nature of [the relationship between the student and his advisor], may assume a fiduciary duty to the student." 119 F. Supp. 2d at 98.

The court must also consider when Walden's duty to the plaintiff terminated. In order for the continuing course of conduct doctrine to apply, "[t]hat duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong." *Fichera*, 207 Conn. at 209.  The court finds that Walden's duty terminated when Johnson received his doctorate from Walden. Although the parties do not seem to agree on the date of this event, it is clear that the plaintiff received his degree well within three years of the initiation of this action on January 10, 2008.[2]  For these reasons, Johnson's tort and CUTPA claims survive the defendant's statute of limitations argument.

ii. Contract Claims

Johnson alleges that Walden breached an implied promise that if he successfully completed the Program, he would be  "qualif[ied] . . . to practice in psychology offering counseling and guidance to clients." (Dkt. # 1, at 15, ¶ 73.) Johnson also alleges promissory estoppel and breach of implied covenant of good faith and fair dealing, both of which are contract-

---

[2]The defendant contends that the plaintiff was awarded a doctorate degree on "November 26, 2006," (dkt. # 28, ¶ 31), while the plaintiff asserts that he received that degree on "February 2, 2007." (Dkt. # 31-2, ¶ 31.)

based claims derived from the implied contract claim. *See Torrington Farms Association v. City of Torrington*, 75 Conn. App. 570, 571 (2003) (a claim of promissory estoppel "is a claim for breach of contract"); *Bellemare v. Wachovia Mortgage Corp.*, 94 Conn. App. 593, 610 (2006) ("a claim brought pursuant to a contract, alleging a breach of the implied covenant of good faith and fair dealing, sounds in contract").  Conn. Gen. Stat. § 52-576 provides in pertinent part that "[n]o action . . . on any . . . implied contract . . . shall be brought but within six years after the right of action accrues . . . ."

"In general, the statute of limitations for a breach of contract action begins to run when a cause of action 'accrues' . . . ." *Goldwasser v. Smith Corona Corp.*, 817 F. Supp. 263, 270 (D. Conn. 1993), *aff'd per curiam*, 26 F.3d 137 (Fed. Cir. 1994). "The true test for determining the appropriate date when a statute of limitations begins to run is to establish the time when the plaintiff first successfully could have maintained an action. That is, an action cannot be maintained until a right of action is complete and hence, the statute of limitations cannot run before that time." *Rosenfield v. I. David Marder & Associates*, *LLC*, 110 Conn. App. 679, 686 (2008) (internal quotation marks omitted). "A cause of action does not accrue for the purposes of a statute of limitations until all elements are present, including damages, however trivial." *Id.* (internal quotation marks omitted).

"Applied to a cause of action, the term to accrue means to arrive; to commence; to come into existence; to become a present enforceable demand." *Polizos v. Nationwide Mutual Insurance Co.*, 255 Conn. 601, 608 (2001) (internal quotation marks omitted). In *Polizos*, the plaintiff, who had been injured in an automobile accident and was unable to collect a civil judgment obtained against the driver of the other vehicle and the company that had leased the

vehicle to that driver, made a claim for uninsured motorist benefits with her automobile liability

carrier Nationwide Mutual Insurance Company.  Nationwide denied the plaintiff's claim on the

basis of the statute of limitations applicable to contracts, Conn. Gen.Stat. § 52-576. Nationwide

contended that because the driver of the other vehicle was uninsured at the time of the accident,

the cause of action accrued, and thus the statute of limitations began to run, as of that date. The

Connecticut Supreme Court disagreed and concluded  that "because the statute of limitations

under § 52-576(a) is based on the accrual of a cause of action, and accrual of a cause of action for

uninsured motorist benefits is dependent upon a plaintiff's ability to enforce the uninsured

motorist contract, the time for commencing such an action begins to run when the plaintiff knew

or should have known that the tortfeasor was uninsured." *Id.* at 616. In reaching this conclusion,

the Court stated that "although the plaintiff, *theoretically* could have initiated an action against the

tortfeasor on the date of the accident, using the date of the accident as the accrual date for her

uninsured motorist action would require the plaintiff to have made a claim against the defendant

before she had any awareness of a coverage problem, or essentially, before she knew of her right

to bring an action against the defendant." *Id*. at 611 (internal quotation marks omitted).

Applying these principles to Johnson's breach of contract claim, the court concludes that

this cause of action, founded on an alleged implied promise that Johnson would be qualified to

become a practicing psychologist upon successful completion of the Walden Program, did not

accrue prior to the time Johnson successfully completed the Walden Program. Since that occurred

well within six years of the initiation of this action, Johnson's implied contract claim is not barred

by the statute of limitations. Likewise, the plaintiff's promissory estoppel and breach of implied

covenant of good faith and fair dealing claims, which are contract-based claims derived from the

-17-

implied contract claim, are not barred by the statute of limitations.

 D.  Fraudulent Misrepresentation

In Count I of his complaint, the plaintiff alleges that representations made to him by and on behalf of Walden, i.e., that he would be qualified to practice psychology upon successful completion of the Walden Program, "were untrue and known to be untrue by the parties making them." (Dkt. # 1, at 13, ¶ 74.)  He further alleges that he "act[ed] upon the false representations to his [economic] injury." (*Id.* at 13, ¶ 76.)  The plaintiff asserts that the allegations contained in Count I state a cause of action in fraudulent misrepresentation. The defendant contends that the allegations in Count I fail as a matter of law. The court concludes that the plaintiff has provided evidence as to this claim that is sufficient to survive the defendant's summary judgment motion.

"The essential elements of a cause of action in [fraudulent misrepresentation] are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury." *Centimark Corp. v. Village Manor Associates Ltd. Partnership*, 113 Conn. App. 509, 522 (2009) (internal quotation marks omitted). "Additionally, the party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal. . . . The determination of what acts constitute fraud is a question of fact . . . ." *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 518 (2006)(internal quotation marks omitted).

-18-

With respect to the first element of this cause of action, the plaintiff has provided evidence that his Faculty Mentor, Dr. Anderson, told the plaintiff that he could become a practicing (licensed) psychologist through successful completion of the Walden Program. Dr. Anderson himself testified that he had a follow-up communication with the plaintiff at the time the plaintiff "was moving into . . . health psych from sports psych" for the purpose of "ensur[ing] that Greg was moving acceptably down a path." (Dkt. # 33-3, at 4.)  At the time of this follow-up communication, it was Dr. Anderson's impression that the plaintiff still wanted to be a practicing psychologist, and Dr. Anderson does not recall telling the plaintiff that the health psychology specialization would not be suitable for meeting that goal.

According to the defendant, Dr. Anderson's statements to the plaintiff cannot be considered evidence that supports a claim of fraudulent misrepresentation because "there is no evidence that any alleged verbal representation by Dr. Anderson was made as a statement of fact rather than as an opinion . . . ." (Dkt. # 27, at 12.) "While the general rule is that the expression of an opinion cannot constitute fraud, such rule is not hard and fast, because whether a given representation is an expression of opinion or a statement of fact depends on the circumstances of the particular case. Where the relation between the parties is such that they do not deal at arm's length, as where the person expressing the opinion has, or professes to have, superior knowledge, the expression of an opinion may constitute fraud." *Leonard-Anthony Assoc., LLC v. Sherman Gardens, LLC*, CV085018651S, 2009 Conn. Super. LEXIS 1851, at *11 (Conn. Super. June 29, 2009) (internal quotation marks and citation omitted). According to the Walden Handbook, a student's Faculty Mentor "will guide you [the student] through the journey of your  academic studies" and is assigned "after a careful assessment of the student's background and professional

goals." (Dkt. # 27-4, at 11.) The plaintiff has provided evidence that his Faculty Mentor, Dr. Anderson, who was himself a licensed psychologist, advised the plaintiff that he too could become a practicing psychologist through successful completion of the Walden Program. Accepting the plaintiff's facts as true, the court concludes that such representations satisfy the first element of a cause of action in fraudulent misrepresentation. Under the circumstances of this case, where the representations at issue were made by the person specifically assigned to "guide you [the plaintiff] through the journey of your academic studies," these expressions could constitute fraud.

With respect to the second element of this cause of action, the defendant argues that there is no evidence that the representations made by Dr. Anderson were known by him to be untrue when he made them. "In matters susceptible of actual knowledge, if the party who has and is known to have the best means of knowledge, makes an affirmation contrary to the truth, in order to secure some benefit to himself, the law treats him as stating that he knows that whereof he affirms, and so as guilty of a fraud, although he spoke in ignorance of the facts; because he asserts that he knows what he does not know." *Clark v. Haggard*, 141 Conn. 668, 672 (1954) (internal quotation marks omitted).  The court concludes that the plaintiff's facts fit within the *Clark* framework and thereby satisfy the second element of a fraudulent misrepresentation cause of action.

The defendant also asserts that because the plaintiff was already enrolled in the Walden Program at the time Dr. Anderson became the plaintiff's Faculty Mentor, any representations made by Dr. Anderson did not induce action by the plaintiff. The court does not agree with this position. The plaintiff has clearly alleged that he "relied on [Dr. Anderson's] comments and

-20-

understanding to help me get through this course as a guide to become a licensed sports psychologist ." (Dkt. # 27-2, at 14.)  There  is sufficient evidence to support a finding that the representations made by Dr. Anderson on behalf of Walden induced the plaintiff to continue in the Walden Program as a means of achieving his goal of becoming a practicing psychologist. This evidence satisfies the third and fourth elements of a fraudulent misrepresentation cause of action. Consequently, the defendant's motion for summary judgment is denied as to this cause of action.

E. Negligent Misrepresentation

"Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Centimark Corp.*, 113 Conn. App. at 518 (internal quotation marks omitted). The defendant contends that "there is no evidence that Walden made any misrepresentations . . . [and] no evidence supporting that Plaintiff reasonably relied on any misrepresentation." (Dkt. # 27, at 14.) The plaintiff's negligent misrepresentation claim is based on the same alleged representations that pertain to the claim of fraudulent misrepresentation. For the reasons articulated above with respect to the plaintiff's fraudulent misrepresentation claim, the court concludes that the plaintiff's evidence, accepted as true, satisfies the required elements of a negligent misrepresentation cause of action. Consequently, the defendant's motion for summary judgment is denied as to this cause of action.

F. CUTPA

The plaintiff alleges that "[t]he facts disclosed to Johnson by Walden and its agents, concerning whether Johnson's completion of Walden's Professional Psychology Program would

qualify him to practice in psychology offering counseling and guidance to clients . . . constituted an actual deceptive practice or a practice amounting to a violation of public policy in contravention of the Connecticut Fair Trade Practices Act . . . ." (Dkt. # 1, at 14, ¶ ¶ 76, 79.) The defendant argues that the plaintiff's CUTPA claim fails because "[t]here was absolutely no attempt to deceive or mislead [the plaintiff] whatsoever," and also because "there is absolutely no factual nexus between Connecticut and any of the alleged improper actions by Walden that could conceivably constitute trade or commerce." (Dkt. # 27, at 15, 16.)  The court concludes that the plaintiff's evidence demonstrates a genuine material issue of fact as to the substance of the CUTPA claim and further concludes that the plaintiff's evidence supports a finding of a nexus between Connecticut and the acts of the defendant at issue in the CUTPA claim.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise - - in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 155 (2005) (internal quotation marks omitted).

The defendant argues that the "[p]laintiff bases his entire CUTPA claim on the fact that

-22-

Walden used the term 'practicing psychologist' in an introductory section of the Handbook." (Dkt. # 35, at 8.) Count III of the plaintiff's complaint, which asserts a CUTPA claim, relies not just on statements contained in the Walden Handbook, however, but includes allegations of statements and representations made by Walden officials, including representations made by Dr. Anderson that the plaintiff could become a practicing psychologist through successful completion of the Walden Program.  Additionally, the court has already determined that the evidence provided by the plaintiff could support a finding of fraudulent misrepresentation. "Intentional misrepresentation, or fraud, is unquestionably a practice that offends public policy. Therefore, [the plaintiff] sufficiently allege[s] facts to support the first prong of the cigarette rule. Further, th[is] plaintiff[] sufficiently allege[s] that the conduct of the defendant[] with regard to the misrepresentation was 'immoral, unethical, oppressive, or unscrupulous,' thus satisfying the second prong of the cigarette rule. It is submitted that th[is] plaintiff[] sufficiently allege[s] a CUTPA violation as [he] allege[s] facts that satisfy the first and second prongs of the cigarette rule." *Dispazio v. Oakleaf Waste Management, LLC*, NNHCV 106012650, 2011 Conn. Super. LEXIS 404, at * 58 (Conn. Super. Feb. 18, 2011) (internal quotation marks and citation omitted).

The defendant also contends that "there is absolutely no factual nexus between Connecticut and any of the alleged improper actions by Walden . . . ." (Dkt. # 27, at 16.) The court has previously determined that the plaintiff's evidence could support a finding of a continuing duty on the part of Walden that did not terminate until the plaintiff received his doctorate from Walden, which was well after the plaintiff had relocated to Connecticut. For that reason, the court concludes that a reasonable juror could find a factual nexus between Connecticut and the alleged improper actions by Walden. Consequently, the defendant's motion for summary judgment is

denied as to the CUTPA claim.

G. Implied Contract

In Count IV of his complaint, the plaintiff alleges that Walden breached an implied promise that if he successfully completed the Program, he would be "qualif[ied] . . . to practice in psychology offering counseling and guidance to clients." (Dkt. # 1, at 15, ¶ 73.) "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Seligson v. Brower*, 109 Conn. App. 749, 753 (2008) (internal quotation marks omitted). The court believes the evidence provided by the plaintiff is sufficient to satisfy the basic elements of a contract claim. The defendant maintains, however,  that the plaintiff's implied contract claim is an impermissible education-based claim pursuant to the holding of the Connecticut Supreme Court in *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996). In *Gupta*, the Connecticut Supreme Court articulated the principle that a contract claim based on inadequate educational services is generally not cognizable since it asks the court "to evaluate the course of instruction [and] . . . review the soundness of the method of teaching that has been adopted by [that] educational institution." 239 Conn. at 590 (internal quotation marks omitted). "This is a project that the judiciary is ill equipped to undertake." *Id*. "There are, however, at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services. The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. The second would arise if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id*. at 592-93 (citations

-24-

omitted).

The plaintiff contends that his complaint fits within both of the exceptions recognized in *Gupta*. According to the plaintiff, his evidence supports a finding that Walden failed in a fundamental respect, since it could not offer him "any of the courses necessary to obtain his stated goal of achieving a career as a practicing psychologist." (Dkt. # 31, at 10.) He also claims that Walden failed to fulfill a specific contractual promise to him, i.e., that he would be qualified to become a practicing psychologist by virtue of his successful completion of the Walden Program in either the sports or health specialization. The defendant argues that neither of the *Gupta* exceptions applies to the plaintiff's implied contract claim. On the basis of the alleged representations made to the plaintiff by his Faculty Mentor Dr. Anderson, the court is satisfied that the plaintiff has established a genuine issue of material fact as to whether Walden made and failed to fulfill a specific contractual promise to him. Consequently, the court concludes that the defendant is not entitled to summary judgment as to the implied contract claim on the basis of *Gupta*.

The defendant also contends that the plaintiff's implied contract claim is barred by Connecticut's statute of frauds, "given that the contract could not possibly have been performed in less than a year." (Dkt. # 27, at 20.) Conn. Gen. Stat. § 52-550 (a) provides in pertinent part that "[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: . . . (5) upon any agreement that is not to be performed within one year from the making thereof . . . ."

In *C. R. Klewin, Inc. v. Flagship Properties, Inc.*, 220 Conn. 569 (1991), the Connecticut

Supreme Court addressed the question of "whether the provision of the statute of frauds, General Statutes § 52-550 (a)(5), requiring a writing for an 'agreement that is not to be performed within one year from the making thereof," renders unenforceable an oral contract that fails to specify explicitly the time for performance when performance of that contract within one year of its making is exceedingly unlikely." *Id.* at 569-70. In considering that question, the Court noted that "the one-year provision [of the statute of frauds] no longer seems to serve any purpose very well, and today its only remaining effect is arbitrarily to forestall the adjudication of possibly meritorious claims. For this reason, the courts have for many years looked on the provision with disfavor, and have sought constructions that limited its application." *Id*. at 577. Guided by the principle of limited application of the one-year provision, the Court held "that an oral contract that does not say, in express terms, that performance is to have a specific duration beyond one year is, as a matter of law, the functional equivalent of a contract of indefinite duration for the purposes of the statute of frauds. Like a contract of indefinite duration, such a contract is enforceable because it is outside the proscriptive force of the statute regardless of how long completion of performance will actually take." *Id.* at 583-84.

Since the implied contract alleged by the plaintiff did not say in express terms that performance would have a specific duration beyond one year, it is "outside the proscriptive force of the statute regardless of how long completion of performance will actually take." *Id*. 584. The court concludes that neither *Gupta* nor the statute of frauds bars the plaintiff's implied contract claim and the defendant's motion for summary judgment is denied as to that claim.

H. Promissory Estoppel

In Count V of his complaint, the plaintiff raises a cause of action sounding in promissory

estoppel, claiming that the promises made to him by and on behalf of Walden should have been expected to, and did, induce action on his part, including enrolling at Walden and paying Walden fees and tuition, and should be binding on Walden to avoid injustice. The defendant argues that the plaintiff's promissory estoppel claim is insufficient as a matter of law, because the plaintiff cannot claim that he did not know the true state of things with regard to the health specialization within the Walden Program, i.e., that health psychology was a non-licensure specialization. The defendant also asserts that there is no evidence that the plaintiff changed his position in reliance on any promise made by Walden.

"Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief;  and the other party must change its position in reliance on those facts, thereby incurring some injury." *Connecticut National Bank v. Voog*, 233 Conn. 352, 366 (1995) (internal quotation marks omitted). The plaintiff has provided evidence sufficient to support  findings that representations were made by and on behalf of Walden that if he successfully completed the Walden Program, he would be qualified to become a practicing psychologist; that he enrolled and continued in the Walden Program in reliance on those representations; and that he incurred financial injury as a result of his reliance on those representations.

"It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." *Id*. at 367 (internal quotation marks omitted). At the time the plaintiff enrolled in the Walden Program and at the time he

switched from sports psychology to health psychology he was a single parent raising four children while serving as a United States Marine stationed in Okinawa, Japan and running a part-time massage therapy business in Okinawa. Given the circumstances presented by the plaintiff, the court believes any issue as to the reasonableness of the plaintiff's reliance on the defendant's representations is a question of fact that must be resolved by the jury. *See Pippett v. Waterford Development, LLC*, No. 3:01CV1716 (MRK), 2004 U.S. Dist. LEXIS 3833, at * 16  (D. Conn. Feb. 27, 2004) ("As to the issue of due diligence [in the context of an estoppel claim], . . . [t]he question of the reasonableness of Plaintiffs' reliance is also a question for the jury."). As a result, the defendant's motion for summary judgment is denied as to the promissory estoppel claim.

I.  Implied Covenant of Good Faith and Fair Dealing

In Count VI of his complaint, the plaintiff alleges a breach of the covenant of good faith and fair dealing implicit in the contract he claims he entered into with Walden. The defendant asserts that this claim is insufficient as a matter of law because "[t]he undisputed evidence is that Walden did not breach any promise to Plaintiff or deny to Plaintiff the benefits of any actual agreement." (Dkt. # 27, at 23.) Since the court has already found that the plaintiff has established a genuine issue of material fact as to whether Walden made and failed to fulfill a specific contractual promise to him, the court does not agree that this claim is insufficient as a matter of law.

The defendant also posits the argument that because under *Gupta* a contract claim in the educational context requires a clear and specific promise, and because the implied covenant of good faith and fair dealing is not a clear and specific contractual promise, the plaintiff cannot maintain his claim of a breach of the implied covenant of good faith and fair dealing. The court is

not persuaded by this argument. The question of whether a specific contractual promise was made to the plaintiff by the defendant goes to whether the plaintiff has stated a contract claim cognizable under *Gupta.* If the plaintiff can establish that such a contract existed, that contract, as is the case with all contracts, would give rise to the implied duty of good faith and fair dealing. "It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . '[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793 (2000) (citation omitted) (quoting Restatement (Second) of Contracts § 205 (1979)). The court concludes that the defendant is not entitled to summary judgment as to the plaintiff's claim of a breach of the implied covenant of good faith and fair dealing.

### III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (**dkt. # 26**) is **DENIED**.

**SO ORDERED** this  9th   day of December,  2011.


_____/s/ DJS_____
              DOMINIC   J.   SQUATRITO
              UNITED STATES DISTRICT JUDGE


-29-